Fecteau, J.
This is an action by the plaintiff, Jane Ellis (“Ellis”), a minority shareholder of Varney Bros. Sand & Gravel, Inc. (“Varney Bros.”), a closely-held corporation, against the corporation and its directors and officers. The defendant Linda Varney (“Linda”) is president of the corporation and is the stepmother of the plaintiff, having been married to the plaintiffs late father, Richard E. Varney (“Richard”). The defendant Jon Varney (“Jon”), stepbrother of the plaintiff, is vice president and a director and shareholder; the defendant Barbara Jerrier (“Jerrier”) is a vice president, director and employee; and the defendant Bartholomew Molloy (“Molloy”) is clerk and a director.
Ellis complains, individually and derivatively, that Linda, with the compliciiy of the directors and officers, was engaged in self-dealing in several respects, and took actions that were detrimental to the corporation and to Ellis’s interest as a shareholder. She alleges, essentially, that the officers and directors have breached their fiduciary duties to her as a minority shareholder, denying her the benefits of her ownership interest and have frozen her out of the conduct of the affairs of the business.. She brings a derivative shareholder action on behalf of the corporation to recover amounts diverted because of self-interest and to recover the value of her ownership and/or the value of her proportionate share of increased profit to which she would have been entitled to receive as dividends on account of profit distributions in which she, and other shareholders should, but do not regularly receive. Ellis also seeks an accounting, a rescission of the written employment agreement between the corporation and Linda, and a rescission of an amendment to the corporate by-laws regarding a restriction on the transfer of shares by giving a right of first refusal to the corporation and its other shareholders.[2] Ellis further seeks to require the corporation to establish a dividend payment policy and to have the directors replaced by persons independent of the Varney family.
The defendants deny any self-dealing, contending that all matters complained of by Ellis were done in good faith for the legitimate business purposes and needs of the corporation and that Ellis either consented to, or failed to timely object after notice to her of some of the matters of which she now complains. In addition, the defendants contend that Ellis has breached her own fiduciary duty of good faith owed to the corporation and to her fellow shareholders by having brought a lawsuit that was not motivated by legitimate corporate and shareholder purposes, but rather was motivated as a part of a divorce settlement agreement.
Trial commenced before me, sitting without jury, on March 3, 2003,[3] and evidence was received on March 4-6, 10-13, 17-21, and 24-25, 2003. The parties were granted leave until April 3, 2003, to prepare their final arguments and until April 15, 2003, to file requests *396 for findings of fact and rulings of law. The matter was taken under advisement at that time.
Upon consideration of the credible evidence, findings of fact and rulings of law are made as follows.
FINDINGS OF FACT
I. Introduction: Description of specific claims[4]
A.Plaintiffs “derivative” claims for damages
The plaintiff has described the claims that she is prosecuting on behalf of the corporation as follows.
1. Breach of fiduciary duty in connection with Linda Varney’s employment agreement.
Count I of the complaint alleges that the individual defendants breached their fiduciary duties to the corporation by “making and enforcing the employment agreement” (Supplemental Complaint (“Complaint”), subpara. 30.a.), paying grossly excessive compensation to Linda, and “draining off the Company’s earnings in the form of exorbitant salaries, bonuses and perquisites.” (Complaint, subpara. 30.b.) Count II of the complaint seeks a declaration that the employment agreement and all promissoiy notes made under color of it are invalid, and null and void. Ellis seeks an order requiring Linda to repay the corporation the damages that the corporation sustained in connection with the agreement, and a judgment holding the other individual defendants liable to the corporation in damages for the same amount of money, on the ground that they approved or acquiesced or defended the transaction, as directors.
2. Waste of Corporate Assets: the Hopedale property; the overpayment of Linda’s drawing account balance; the payment of $150,000 in “salary” to Linda in 1987; and the two $10,000 checks.
Count I of the complaint alleges at subparagraph 30.h. that the defendants “allowfed] company assets to be wasted.” This claim involves four sets of transactions by which the corporation transferred assets for inadequate consideration, or for no consideration at all. In each case, the judgment sought is for the benefit of the corporation.
With respect to the Hopedale properly, Ellis seeks a judgment against each of the individual defendants, for the amount that the corporation paid in excess of the value of the land, or $450,200, with interest on the $150,000 paid to Linda from August 1993.
With respect to the claim involving the overpayment of Linda’s drawing account balance, Ellis seeks a judgment against Linda and Jerrier for $147,000. With respect to the payment of $150,000 purportedly as salary for Linda for the year 1987, Ellis seeks a judgment for damages against Linda and Jerrier for $150,000, with interest from January 1, 1988.
With respect to the $10,000 checks, Ellis seeks a judgment for damages of $20,000 against Linda and Jerrier, with interest from December 7, 1992, the date the second of the two checks was deposited for payment. The plaintiff contends that the defendant directors are responsible for the damages, as specified in the preceding two sections, because they participated in, approved or acquiesced in the transactions.
B. Plaintiffs “direct” claims for damages
1. Claim for conversion or unlawful interference with Ms. Ellis’ receipt of 45 shares of Varney Bros, stock free of trust.
This claim relates to the 45 shares of Varney Bros, stock that the Milford National Bank and Trust Company, as trustee of the Clarence Varney trust, held in the Jane W. Ellis Voting Trust. Count I, subparagraph 30.c., of the complaint alleges that the defendants “conspir(ed) to deny Jane the right to own [the stock] free of trust.” The gravamen of this claim is that the defendants interfered with the trustee’s stated intention to distribute the stock, and that in consequence, Ellis was deprived for approximately a decade, from January 1993 to August 2002, of the inheritance her grandfather had left her. Ellis alleges that this amounted to a conversion of the stock, and seeks damages based upon the loss of use of the stock during the period of time it was wrongfully detained. The plaintiff presses this claim against Linda and Molloy.
2. Claim for the conversion or unlawful retention of Milford National Bank and Trust Company stock, held in the Donald Varney trust.
Subparagraph 30.f. of the complaint alleges that Linda “wrongfully depriv[ed] Jane of the fair value of 213 shares of stock” in the Milford National Bank and Trust Company. Ellis seeks a finding of liability for wrongful detention of the stock, and a judgment ordering Linda to distribute to Ellis the 213 shares of stock.
C. Other remedies sought by the plaintiff
In addition to the compensatory damages referenced above, Ellis contends that based upon the cumulative impact of the specific actions and events alleged, without additional equitable relief in the nature of orders that require a removal of officers and directors and the reconstitution of the board of directors and for the declaration of a dividend policy, the defendants will continue to breach their duties to the corporation and to her as a minority shareholder, notwithstanding the delivery to her of her shares.
II. Historical Facts
A. General facts about the histoiy and business of Varney Bros. Sand & Gravel, Inc.
1. Varney Bros. Sand & Gravel, Inc. (“Varney Bros.”) is a closely held family corporation. (Ex. 59.) Varney Bros., located on Hartford Avenue, in Bellingham, Massachusetts, was established in the 1930s as a partnership between two brothers, Clarence E. Varney (“Clarence”) and Donald A. Varney (“Donald”). (Ex. 1.) Clarence had one child, Richard C. Varney (“Richard”), who was born in 1933. Donald was married to Harriet Varney, but the couple was childless. Clarence and *397 Donald together ran Varney Bros, during its early years, with Donald holding the title of President and Clarence the title of Treasurer. Richard joined the company in the late 1950s or early 1960s. Richard was active in the management of Varney Bros, during the lifetimes of Clarence and Donald. Clarence died in September 1971, and Richard assumed the title of Treasurer. Thereafter, Donald and Richard together ran Varney Bros, until Donald’s death in October 1978. (Ex. 54.) Richard was then left to manage Varney Bros, by himself.
2. Clarence and Donald incorporated Varney Bros, in 1951.[5] Among the corporate purposes for which Varney Bros, was established were “manufacturing, producing, buying and selling and otherwise dealing in sand, gravel, stone, loam, concrete” and other materials, “building, maintaining or repairing and contracting to build and repair highways, structures, or anything else involving the use of any of the foregoing materials,” and “to purchase, acquire, hold, own, sell, lease or otherwise dispose of all kinds of properly, real or personal, of any kind or nature, necessary, convenient, or incidental to any of the foregoing purposes.” (Ex. 1, page 1.)
3. During the early years of Varney Bros.’s business, Clarence and Donald caused it to purchase extensive tracts of real estate in Bellingham and surrounding localities as potential sources of raw materials for use in its business of manufacturing concrete, ultimately totaling in area, at one point in time, approximately 3,000 acres. Over the years, Varney Bros, has diversified its business interests. It manufactures and sells ready-mix concrete in Bellingham and surrounding areas; it sells by-products of its concrete manufacturing operation; it owns and operates a large working farm in Mendon on which it raises cattle, other livestock, and hay; it owns and rents several pieces of residential real estate in Bellingham and surrounding communities; from time to time it harvests and sells timber from vacant tracts of real estate it owns; and, beginning in the early 1990s, it has entered into various commercial real estate transactions including the sale of certain parcels of unused corporate real estate. As a result of those transactions, Varney Bros, now owns equity interests in two shopping malls, which the parties refer to as the Stallbrook and the Charles River developments, located in Bellingham at the northeast and southeast quadrants, respectively, of a cloverleaf intersection with Route 495. In addition, it receives income from an option-to-purchase it sold on another parcel of corporate real estate to a developer (which the parties call the Southwest Quadrant). Varney Bros, has also engaged in recent years in negotiations for the development and/or sale of other parcels of corporate real estate.
B. The parties
4. Richard Varney, now deceased, had three children: Ellis, born in May 1960, his only child with his first wife Deborah, to whom he was married from 1958 to 1971; Jon Varney, born in April 1973; and Elizabeth Varney, born in April 1977 (not a party herein). Both Jon and Elizabeth are Richard’s children by his second wife, Linda, whom he married on December 29, 1971, and to whom he remained legally married until his death on March 23, 1992.[6] (Ex. 54.)
5. Ellis is a shareholder in Varney Bros. She currently owns 95 shares of its stock, which is slightly less than one-third of the total. She first became beneficially interested in Varney Bros, stock in March 1992, and legal title to one portion of these shares of Varney Bros, stock became hers outright in 1998, and to a second block in 2002.
6. Jon is a shareholder in Varney Bros. He also currently owns 95 shares of its stock.[7] He, like Ellis, first became beneficially interested in Varney Bros, stock in March 1992, and first owned legal title to Varney Bros, stock in 1998. He was elected a director and vice-president of Varney Bros, in October 1991.
7. Linda is a director of Varney Bros, and its president and treasurer. She was first elected a director in 1979 and retained that position through 1986. She was returned to the Board of Directors in February 1991, and has remained a director ever since. She has been president since 1979 and president and treasurer since 1992. From October 15, 1992, until January 1998, she, as trustee of the Donald A. Varney Trust, owned legal title to 150 shares of Varney Bros, stock, but no beneficial interest in them. Between March 1994 and an unknown date in 1999, she owned the beneficial interest in 15 shares of Varney Bros, stock as lifetime beneficiary of a trust. She has never owned any Varney Bros, stock outright and has not owned legal title to any such stock since January 1998.
8. Jerrier has never owned any interest in Varney Bros, stock. She has been an employee since approximately 1983, and a director and vice-president of Varney Bros, since February 1987.
9. Molloy has never owned any interest in Varney Bros, stock. He has been a director and the clerk of Varney Bros, since May 1996.
C. General history of stock ownership
10. The total authorized capital stock of Varney Bros, is 500 shares of common stock. 300 shares of the authorized common stock were issued in 1951, 150 shares to Clarence and 150 shares to Donald. The remaining 200 shares remain unissued. Originally there were no restrictions upon ownership of the stock. (Ex. 1, page 2.)
11. On February 27, 1967, Donald transferred his 150 shares of Varney Bros, stock to a trust, the Donald A. Varney Trust (“DAV Trust”), of which Donald himself was the trustee. (Ex. 3; Ex. 58; Ex. 59.) The Donald A. Varney Trust instrument contains, among others, the following provisions:
*398 (a) it appointed Richard as successor trustee in the event of Donald’s death or incapacity;
(b) the trustee was to pay to Donald or use for Donald’s benefit so much of both the income and principal of the trust as the trustee elected; or, in the event of Donald’s incapacity, the successor trustee was to pay or use so much of the income and principal of the trust as the successor trustee decided in his sole discretion was advisable for the comfortable support, health and maintenance of Donald and his wife Harriet;
(c) following Donald’s death, assuming he predeceased his wife Harriet, the successor trustee was to pay to Harriet or use for her benefit the net income of the trust and so much of the principal as the successor trustee in his sole discretion deemed advisable in the event of Harriet’s sickness or prolonged ill health;
(d) upon Harriet’s death, the successor trustee was to pay over the trust fund to Richard free of trust or, if Richard predeceased Harriet, to Richard’s issue per stirpes;
(e) in the event any portion of the trust estate were to become payable to a minor, distribution free of trust of the minor’s share was to be deferred until the minor reached the age of 21. Until such time, the successor trustee was to pay to the minor or use for the minor’s benefit so much of the income and principal of the minor’s share of the trust as the successor trustee, in his sole discretion, deemed advisable for the comfortable support, maintenance, education and advancement of the minor;
(f) the trustee and successor trustee were given sole discretion to buy, sell, pledge, lease, mortgage and otherwise deal with trust property and to borrow money upon such terms and conditions as he deemed advisable;
(g) the trustee and successor trustee were given sole discretion, when dividing or distributing trust property, to make such division or distribution in cash or in kind, or partly in each, at such reasonable valuations as the trustee or successor trustee determined were fair;
(h) Richard was empowered to appoint a successor trustee either while living or by his will.
(Ex. 3.)
12. Clarence retained his 150 shares of Varney Bros, stock until his death in 1971. (Ex. 56.) By his will and a codicil to his will, Clarence created a testamentary trust, hereinafter called the Clarence E. Varney Trust (“CEV Trust”), to hold his 150 shares of Varney Bros, stock. Clarence’s will and codicil contain, among others, the following provisions with respect to the CEV Trust:
(a)Shelley D. Vincent was appointed trustee and, in the event of his inability or unwillingness to serve, the Milford National Bank and Trust Company was appointed trustee;
(b) the trust assets were to be held for the benefit of Richard, with income to be paid quarterly to or for the benefit of Richard and with the trustee authorized, in his discretion, to “distribute such parts or all of principal” to Richard for his comfort, maintenance, support, happiness or education;
(c) the trustee was, among other things, granted “uncontrolled discretion”: to sell any part of the trust estate; to borrow money and use assets of the trust estate as security for the loan; to transfer stock held in the trust to voting trusts; to compromise, contest, or settle any claims; to vote stock held in the trust; in dividing the principal or the trust estate and in distributing principal and income from it; in transferring stock held in the trust at valuations deemed just by the trustee, such valuations to be conclusive; and “generally to take any action as owner with respect to any property” held in the trust “which the Trustee may deem to be for the best interests of the trust”;
(d) all estate and inheritance taxes were to be paid by the trustee from the trust assets;
(e) upon Richard’s death, the assets of the trust were to be held for the benefit of Clarence’s grandchildren in equal shares. Income was to be paid to the beneficiaries quarterly or, in the trustee’s discretion, more frequently. The trustee was, in addition, granted discretion to distribute part or all of the principal for the comfort, maintenance, support, happiness or education to the beneficiaries;
(f) when any grandchild born prior to Clarence’s death reached age 25, the trustee was directed to pay over one-half of the grandchild’s share of the trust estate free of trust; and upon such grandchild reaching age 30, the trustee was to pay over the remaining half of the grandchild’s share free of trust;
(g) when any grandchild born after Clarence’s death reached age 21, the trustee was directed to pay over the grandchild’s full share of the trust estate free of trust;
(h) payments of principal made by the trustee to any grandchild for his comfort, maintenance, support, happiness or education were to be charged to his share of the estate, so that no grandchild would profit as a result of such advances.
(Ex. 2.)
13. When Donald died in October 1978, he was survived by his wife Harriet. Richard became trustee of the DAV Trust upon Donald’s death. Richard remained trustee of the DAV Trust until his own death on March 23, 1992. Harriet was living at the time of Richard’s death and was, throughout Richard’s tenure as trustee, the sole present beneficiary of the DAV *399 Trust. None of the Varney Bros, stock held in the DAV Trust was sold or distributed during Richard’s tenure as trustee. (Ex. 59.) As trustee of the DAV Trust, Richard was record owner of the 150 shares of Varney Bros, stock held in the trust and was entitled to vote those shares. (Ex. 58.)
14. In 1975, the trustee of the CEV Trust sold 15 shares of Varney Bros, stock to Richard for the purpose of raising cash to pay taxes which, pursuant to the terms of the trust, were to be paid out of the trust assets. Thereafter the trustee of the CEV Trust held 135 shares of Varney Bros, stock for Richard’s benefit. No other shares of Varney Bros, stock held in the CEV Trust were sold or distributed during Richard’s lifetime. (Ex. 56; Ex. 59.) Richard continued to own those 15 shares of stock until his death on March 23, 1992.
15. Of the 300 issued shares of stock in Varney Bros., after Donald’s death in October 1978, and up to his own death on March 23, 1992, Richard at all times owned 15 shares of Varney Bros, stock outright, held title to 150 shares of Varney Bros, stock as trustee of the DAV Trust, with a residual beneficial interest in those shares contingent upon his surviving Harriet, and owned the present beneficial interest in the remaining 135 shares of Varney Bros, stock held for his benefit in the CEV Trust. (Ex. 56; Ex. 58; Ex. 59.)
16. When Richard died on March 23, 1992, the DAV Trust, with Donald’s widow Harriet Varney still living and the sole present beneficiary of the trust at that time, was left without a trustee. Linda, after due notice to Ellis and other interested persons but without any objection, was appointed successor trustee of the DAV Trust on October 15, 1992, by the Worcester County Probate Court. (Ex. 10; Ex. 60; Ex. 61.)
17. When Richard died on March 23, 1992, the Milford National Bank and Trust Company (“the Milford”) was the trustee of the CEV Trust, having succeeded Shelley D. Vincent, Jr. upon his death. (Ex. 2; Ex. 56.)
18. Upon Richard’s death, Ellis, Jon and Elizabeth Varney each became the beneficial owner of 45 shares of Varney Bros, stock held in the CEV Trust by the Milford. The Milford, as trustee, owned legal title to all 135 shares of Varney Bros, stock it held in trust. (Ex. 36; Ex. 59; Ex. 107.) In late 2002, the Milford distributed free of trust all 135 shares of the Varney Bros, stock held in the CEV Trust. Ellis, Jon, and Elizabeth Varney each received 45 shares of stock free of trust. (Ex. 56; Ex. 59.)
19. In January 1998, Linda distributed free of trust all of the Varney Bros, stock held in the DAV Trust. Ellis, Jon, and Elizabeth Varney each received 50 shares of stock free of trust. (Ex. 58.)
20. Upon Richard’s death on March 23, 1992, the 15 shares of Varney Bros, stock which he owned outright became an asset of his estate. (Ex. 42, First Account, Schedule C, and Inventory filed March 2, 1994.) Pursuant to Richard’s will, the 15 shares of Varney Bros, stock which he owned outright were transferred on March 1, 1994, by the Milford, as executor of his estate, to a marital trust of which Linda was the beneficiary during her lifetime. Sometime in 1999, the 15 shares were transferred back to Richard’s estate from the marital trust because of a court judgment that had been entered in the intervening years against the estate, in connection with a claim for services rendered to Richard Varney.[8] (Ex. 42, Third Account, Schedule B, page 4, and Fifth Account, Schedule A; Ex. 11, Revocable Trust; Ex. 25, Richard Varney’s Will.)
D. General history of officers and directors of Varney Bros.
21. The original directors of Varney Bros, were Clarence, Clarence’s wife Dorothy Varney, Donald, Irvin Ammen, and Shelley D. Vincent, Jr. Donald was originally president of the corporation, Clarence was originally the treasurer, and Shelley D. Vincent, Jr. was originally the clerk.[9] (Ex. 1, page 5.) According to the corporate by-laws, the directors were to be elected by the shareholders and the officers, by the directors. (Ex. 55.)
22. Following Donald’s death in 1978, Richard, Linda, and Shelley D. Vincent, Jr., were elected directors of Varney Bros, in February 1979. Linda was elected president of the corporation, Richard remained treasurer, having assumed that position upon Clarence’s death in 1971, and Shelley D. Vincent, Jr., remained clerk. Shelley D. Vincent, Jr.’s son, Shelley D. Vincent, III, was elected assistant clerk, and Donald’s widow Harriet was named a vice-president. (Ex. 71, page 1; Ex. 72.)
23. In February 1987, Jerrier replaced Linda as a director and Shelley D. Vincent, III replaced his father as a director. Richard remained a director. Jerrier replaced Harriet Varney as vice-president and Shelley D. Vincent, III replaced his father as clerk. Linda remained president and Richard remained treasurer. (Ex. 71 (minutes of annual shareholder meeting of 1987); Ex. 72.)
24. In February 1991, the number of directors was increased from three to four, with Linda being elected to rejoin the board as the fourth director. The officers of the corporation remained the same. (Ex. 71, (minutes of annual shareholder meeting of 1991); Ex. 71.) In October 1991, at Richard’s request, Jon was made a fifth director of Varney Bros, and was appointed a vice-president. (Ex. 71, (October 1991, minutes).)
25. The directors and officers of the corporation thereafter remained unchanged until Richard’s death in March 1992, whereupon Linda was elected treasurer. Richard’s position on the Board of Directors was not filled. (Ex. 71, (March 1992, minutes); Ex. 72.)
*400 26. Thereafter, Varney Bros.’s directors and officers remained unchanged until May 1996, when Shelley D. Vincent, III resigned because of ill-health and was replaced as director and clerk by Molloy. (Ex. 71, (May 24, 1996, minutes).) Since that time, Varney Bros.’s directors have been Linda, Jerrier, Molloy, and Jon, and its officers have been Linda (president and treasurer), Jerrier (vice-president), Jon (vice-president), and Molloy (clerk). (Ex. 71; Ex. 72.)
E. History of Linda Varney’s involvement with the businesses of Varney Bros, prior to Richard Varney’s death
27. Varney Bros, was imbued by its founders with a philosophy and a mission that Varney Bros, remain a family business and their actions were consistent therewith. This philosophy and mission became Richard’s as well, and he also acted consistently. Furthermore, in keeping with this overarching philosophy, Linda became involved in certain aspects of Vamey Bros.’s business upon her marriage to Richard due, in part, in order to satisfy Richard’s desires and expectations as well as to satisfy her own sense of fulfillment. Moreover, Richard hoped that his son Jon would eventually succeed him in mnning the corporation, just as he had succeeded his father, Clarence. Richard spoke often to Linda and others of his hope for Jon to some day take over the management of the business.
28. Richard and Linda lived, expense free, in residential property owned by Varney Bros., just as Clarence and Donald and their wives had done.[10] Not long after the marriage, Richard and Linda moved into the farmhouse located on the farm owned and operated by Varney Bros, at 57 Bates Street, Mendon. It became Linda’s responsibility to oversee and manage this 675-acre farm and its employees, oversee the slaughter and sale of meat from the cattle and beef raised on the farm, and to work on the farm herself. Linda did not receive direct payments from Varney Bros, for her services with respect to its farm at any point in time from her marriage in late 1971, until receipt of a payment in 1987 for various but unspecified services she had rendered to the company.
29. In the mid-1970s, Richard, who had been a heavy smoker, began to experience a variety of illnesses, mostly cardiac and vascular in nature, with increasing severity and impact on his physical capabilities. (Exs. 63-67.) In 1980, Richard suffered the first of a series of strokes, due to a blockage of a carotid artery, which left him with physical impairments of varying disability and permanency. Sensation, strength and coordination in his hands and arms were affected, as was his gait; his speech became slightly slurred and the right side of his face drooped slightly. These physical effects did not prevent Richard from running the day-to-day business of Varney Bros., but they made it more difficult for him to do so. In addition, Richard became increasingly irritable, emotionally labile, and difficult to deal with. Although these actual and perceived weaknesses were a source of frustration to him, Richard was perceptive enough to understand and recognize as a businessman that these limitations on his physical abilities and personality caused by these medical events would likely have and did have an adverse impact on his actual and perceived ability to engage effectively in certain aspects of Varney Bros.’s business, including appearances before municipal agencies and boards and negotiations with those with whom Varney Bros, did business, and understood their potential negative impact on the business interests of Varney Bros. (Exs. 63-68.) The state of his health, coupled with Donald’s death in October 1978, caused Richard to need and ask for more assistance from Linda in the conduct of the various business interests of Varney Bros. (See for example Ex. 71 (February 1991, minutes, regarding sale of company land).) Linda was appointed president of the corporation in February 1979. Ellis was, at the time, a teenager away at a college in upstate New York, Jon was a small child and Elizabeth Varney was an infant.
30. Among the additional services that Linda began to provide to Varney Bros, during the 1980s, were preparation for and attendance at hearings related to Varney Bros.’s business interests before municipal boards and agencies; participation with Richard in negotiations and discussions related to prospective real estate ventures; assistance with eminent domain proceedings brought with respect to Varney Bros, properties; management of, including the rental and repair of several residential properties owned by Varney Bros.; oversight of the cutting and sale of timber from Varney Bros.’s various properties; and handling of the company’s insurance needs.
31. In addition, Richard regularly consulted with Linda about many aspects of the corporation’s business. Such services did not require Linda to work full-time or regular hours for Varney Bros, during this period, as the nature of these duties and the nature of Varney Bros.’s business required work during irregular hours, including evenings and weekends, varying in number and frequency. The number of hours she needed to devote to the corporation’s business generally increased as the years passed, with her familiarity with and involvement in various aspects of the business growing as Richard’s health declined. However, as with her efforts on behalf of the company at the farm, Linda received no compensation for these additional services to Varney Bros, through 1986. In 1986, Richard suffered an aneurism that caused him to be admitted to the hospital, during which stay he suffered a heart attack.
III. Facts Specific to the Plaintiffs Derivative Claims A. The 1987 “salary” payment
32. In 1987, Varney Bros, paid and Linda accepted $150,000 in compensation for her services, although *401 she had neither requested nor expected to receive such a payment. Although she was president of the corporation, she had not participated in the decision to grant the compensation. She was not a member of the board of directors at the time. When the payment was presented to her, Richard insisted that she immediately endorse it back to the corporation, net of taxes, in the nature of a loan. Her loan of this compensation back to the corporation was reflected in a “drawing account” established in her name and she subsequently drew on that account.[11]
33.1 infer that in paying Linda $150,000 in 1987, the Board of Directors intended to compensate her not only for her services in that year but also for her unpaid services over the previous fifteen years. I find that Linda’s services to Varney Bros., both before 1987, during that year, and after that year, were of value to the corporation. Payment of $150,000 to Linda in 1987 was a reasonable exercise of the Board of Directors’ business judgment as to what her services to the corporation were worth. Under all the circumstances, the payment of $150,000 to Linda in 1987 was not excessive compensation for services she provided between 1972 and 1987.
B. The Hopedale land transaction
34. Sometime in the late 1980s, a piece of Varney Bros.’s real estate had been taken by eminent domain. Varney Bros, realized a taxable gain of at least $300,000 from this taking. Varney Bros, had an opportunity to avoid or defer paying approximately $90,000 in capital gains taxes if it used the gain to purchase another piece of real estate in a “like-kind exchange” within a specified period of time.
35. In 1988, Richard and Linda were each 50% beneficiaries of the R&L Realty Trust (“R&L Trust”), which owned approximately 12 acres of land on Mill Street in Hopedale (the “Land”). Richard was the trustee of the trust. Richard decided in 1989 that the like-kind exchange, which had to be consummated by the end of that year, should be consummated by having Varney Bros, purchase the Land for $300,000.
36. In July 1988, Kevin Doyle, a newly appointed assistant-assessor for the Town of Hopedale, increased the assessment of this parcel owned by the R&L Trust from approximately $12,000 to $296,000. (Ex. 16.) When he made the new assessment, Mr. Doyle did not know anything about this parcel other than its acreage. In August 1988, Linda, on behalf of the R&L Trust, filed with the Town of Hopedale an application for an abatement of the new assessment. (Ex. 16.) She told Mr. Doyle that the Town’s assessment was excessive because the Land was wet and had limited access. On September 7, 1988, Mr. Edward Shea, a civil engineer retained by the trust, wrote to Richard that it appeared to be economically unfeasible to develop the Land because of vegetated wetlands, ledge outcroppings and access issues. Linda forwarded Mr. Shea’s opinion letter to Mr. Doyle in support of her application for an abatement. (Ex. 17.)
37. In response to Linda’s request for an abatement, the Town reduced the assessment of the land in November 1988 to $189,400. (Ex. 18.) Shortly thereafter, Richard called Mr. Doyle to complain that the assessment remained too high. Mr. Doyle testified that the market conditions in Hopedale had collapsed from 1988 to 1989, and that by January 1, 1990, the value of the Land was $14,800. He testified that he based his assessment on the general market conditions and the conclusion that the Land was not a buildable lot. He relied on the Shea Engineering letter (Ex. 17) to arrive at that conclusion, along with the fact that the frontage of the property was only 51 feet, not the 150 required by the Town to build on the property. I find Mr. Doyle’s testimony credible. Linda testified that R&L Realty Trust had obtained a variance in 1978 to build a house on the lot, but that for reasons left unexplained, the Trust never built the house.[12]
38. Richard and Linda were separated and engaged in divorce proceedings beginning in 1989, and discussions between them concerning sale of the Land were conducted through their lawyers. (Exs. 92-95.) Richard proposed that the $300,000 purchase price be paid by Varney Bros.’s giving Linda an unsecured promissory note for $150,000 payable in ten annual installments with interest at 10% per annum and by Varney Bros.’s paying him $150,000 which he would leave in his “drawing account” so that the corporation would have the use of the money. After initial hesitation caused by a belief that the Land was worth more than $300,000, Linda agreed to the purchase price and to accept payment in the form of a $150,000 unsecured promissory note payable over ten years at 10% interest per annum.
39. On December 27, 1989, Richard signed a deed and two promissory notes that he made on behalf of the Corporation to Linda and himself, each in the principal amount of $150,000 and bearing interest at 10% over ten years. Linda did not see or approve the form of the promissory notes before Richard signed them. The first payment under the note was not payable until one year after its execution. Richard drafted the documents involved in the transaction without Linda’s participation and presented them to her in January 1990. (Ex. 95.) Varney Bros, received the tax benefit which the Hopedale transaction was intended to obtain. Linda accepted, in December 1990, the first payment on her promissory note.
40. Richard owned legal title, as trustee of the DAV Trust, to a majority of Varney Bros.’s stock at the time of the Hopedale transaction and owned the residual beneficial interest in all these shares, contingent upon his surviving Harriet Varney. In addition, he was the owner of a lifetime beneficial interest in the remaining Varney Bros, stock under the CEV Trust. Linda was not a director of Varney Bros, at the time of the *402 Hopedale transaction, so her assent to the transaction on behalf of Varney Bros, was not required for Varney Bros, to execute it. (Ex. 71, 1989 and 1990 minutes; Ex. 72; Ex. 55, Art. II, §1.)
41. Notwithstanding its low assessed value, there were several elements to the Hopedale transaction that support a conclusion that overall, it was a reasonable transaction from the perspective of Varney Bros, at the time it was consummated. There was some evidence at the time of the transaction to suggest that the fair market value of the Land was within a reasonable range evidenced by the price paid by Varney Bros; Varney Bros, needed to consummate its “like-kind exchange” quickly in order to achieve the tax savings it sought, and the Hopedale transaction presented an opportunity for a quick purchase; Varney Bros, was able to purchase the Land without paying any up-front cash whatsoever, without giving a mortgage on the property, and without having to make any payments at all until a year after the transaction; inferentially, Varney Bros, was able to avoid the legal and other expenses it would have had to incur if it had purchased property from an outsider rather than from Richard; and Varney Bros.’s acquisition of the Land gave it a parcel of real estate of almost 12 acres in area, and, notwithstanding the likely need for a dimensional variance which it had obtained once before, it probably held some value for limited purposes including limited residential development, in a residential community in which vacant land is now in short supply. The corporation has not put this land to use since acquiring it in 1989, however, and has kept the real estate taxes on this parcel of land paid up since acquiring it.
C. The $10,000.00 checks to Linda Varney’s daughters
42. Linda has two daughters, Tracey and Laurie, by her first marriage. (Ex. 54.) At the time of Richard’s death in 1992, ten checks were found by Linda in Richard’s safe. In 1991, Richard and Linda had prepared these ten checks, five signed by Richard and five signed by Linda, each for $10,000, and intended as personal gifts to Ellis, Jon and Elizabeth Varney, Richard’s three children, and Tracy Anderson and Laurie Armstrong, Linda’s daughters from her first marriage. The checks were drawn on Varney Bros.’s checking account. (Exs. 26; 28.)
43. Prior to and at the time of his death, Richard maintained what was referred to as a “drawing account” with Varney Bros. Richard periodically would lend back to Varney Bros, the salary he was paid, and then he would “draw” upon, the debt Varney Bros, owed him in order to pay personal expenses. At the time of his death, Varney Bros, owed Richard in excess of $500,000 by virtue of his “drawing account.” That debt became a debt owed by Varney Bros, to Richard’s estate. (Ex. 42, First Account, Schedule C, and Inventory filed March 2, 1994.) As has been previously discussed, a drawing account had also been created for Linda based on the $150,000.00 payment she received in 1987. By virtue of these ten checks, intended as personal gifts and to be drawn against their drawing accounts, Richard’s and Linda’s drawing accounts were to be each reduced by $50,000.
44. Richard held all of the checks in his safe. The evidence did not explain the reasons why the checks were not delivered before he died or why he held the checks; there was, also, no evidence that he had changed his mind. After Richard died, Linda retrieved the checks from the safe and delivered two of the checks, signed by Richard, to Tracy Anderson and Laurie Armstrong, which checks were charged against Richard’s drawing account balance, not her own. Because the two $10,000 checks drawn by Richard payable to the order of Tracey and Laurie were intended to be personal gifts by him to them, when the checks were paid they were charged to Richard’s drawing account and the debt owed by Varney Bros, to Richard’s estate was reduced by $20,000. (Ex. 20, Schedule B, 8/31/93 entry; Ex. 42 (same).) Consequently, the two $10,000 checks were not paid with Varney Bros, funds and could not constitute a diversion or waste of Varney Bros, funds even if they were wrongly delivered after Richard’s death. Judgment approving the executor’s account reflecting payment of the two checks was entered by the Worcester County Probate Court on March 14, 1994. If there was wrongdoing with respect to the Richard Varney Estate — as to which no finding is made — Ellis is entitled to no relief with respect to her claims in this case.[13]
D. Linda Varney’s employment contract
45. In late 1988, Richard suffered another stroke. Linda continued to provide services to Varney Bros, in 1988, 1989, 1990 and 1991 for which she did not receive direct compensation. The nature of the services she provided included the same types of activities as in earlier years, but in addition included increased responsibility for assisting with prospective real estate ventures that Richard had under consideration. In January 1989, due largely to an increase in his irritability and frustration secondary to his deteriorating health, Linda decided that she and Richard needed to separate, which he agreed to do, vacating the farm and moving into the company-owned residence once occupied by Donald and Harriet Varney.[14] In March 1989, she caused a complaint for divorce to be filed in the Probate Court.
46. Beginning in 1989 or 1990, Linda began to work full-time for Varney Bros., had an office at Varney Bros.’s headquarters, and became involved in all aspects of the corporation’s business. Beginning in 1990, Linda had responsibility for the day-to-day management of Varney Bros.’s business. Richard no longer came into his office consistently because of his worsening health problems. Richard remained in control of the corporation, however, continued to participate actively in its management, and remained the *403 ultimate decision maker by virtue of his experience and stock ownership.
47. Richard died on March 23, 1992, during another hospitalization, this time for an abdominal aneurism. At that time, Ellis was 31 years old, had graduated from college, was married with two children and lived in Bellingham, Massachusetts. Jon Varney was then almost 19 years old and an engineering student at Rensselaer Polytechnic Institute in upstate New York. Elizabeth Varney was nearly 15 years old and a high school student. (Ex. 54.) Obviously, neither Jon nor Elizabeth Varney had sufficient maturity or experience to assume responsibility for overall management of Varney Bros.’s business and Ellis had taken no steps prior to Richard’s death to become interested in or knowledgeable of the company or involved in its management, nor did she seek involvement at that time. Upon Richard’s death, no member of the Varney family, other than Linda, was available to run the family corporation. No shareholder in Varney Bros., including Ellis, wished Varney Bros, to cease operation or to be sold to outsiders to the Varney family. All shareholders of Varney Bros, have at all times wanted ownership of the corporation to remain in Richard Varney’s descendants.
48. On February 1, 1993, the Board of Directors of the Corporation had voted without a meeting (the “Consent Vote”) to authorize Jerrier to “sign seal and deliver for and on behalf of this Corporation an employment contract with said Linda L. Varney substantially in the form presented and reviewed by the Directors.” (Ex. 51.) On June 1, 1993, slightly more than one year following Richard Varney’s death, Jerrier signed on behalf of the Corporation an employment agreement (“Employment Agreement”) with Linda (Ex. 4), pursuant to the authority of the February 1, 1993 Consent Vote. The Employment Agreement was negotiated on Linda’s behalf by Paul Kane, who had represented her in her divorce action against Richard Varney. The employment contract was negotiated on Varney Bros.’s behalf by its directors Shelley D. Vincent, III, who was a well-known and respected attorney and experienced businessman, and Jerrier, who had detailed knowledge of the company’s finances and who had worked closely with both Richard and Linda for many years. Both Vincent, III and Jerrier had long-standing experience with and knowledge of Varney Bros.’s business.
49. The subject of an employment contract for Linda first arose in the context of settlement negotiations between her and Richard in their divorce action. Settlement proposals discussed between Richard and Linda included, among other things, that Richard would continue to participate actively in management of Varney Bros.; that Linda would likewise participate actively in its management and hold the position of President; that Linda would be paid a salary of $ 1,000 per week, with increases over time, and with non-specified business-related expenses being paid by the company; that the contract would be for a five-year period; and that Linda would participate in profits of Varney Bros, through one of several proposed mechanisms. The extent of Linda’s proposed participation in profits of Varney Bros, was never finally agreed to between Richard and Linda, although discussions included a proposal for participation of up to 50% in the corporation’s profits. Linda testified credibly that Richard had tentatively agreed with her to a 50% share of company profits, but it was never memorialized in writing, and that Richard, not uncharacteristically, changed his mind soon thereafter. However, no mechanism for profit-sharing was ever finally agreed between Richard and Linda (Exs. 50, 84, 86, 87), nor was agreement ever reached between Richard and Linda with respect to settlement of their divorce proceedings or with respect to an employment contract. There is no written evidence that Richard actually agreed to pay Linda $78,000.00 per year for ten years, nor that she should receive any share in company profits, although I infer from the evidence of the divorce negotiations that she had sought a 50% share of net profits from the sale of company land which was countered by his suggestion for her indirect participation in dividends paid to him from the sale of company-owned real estate, in the context of a divorce property agreement. (See Ex. 50, page C-5, §13, (draft agreement prepared by Linda’s divorce attorney Paul Kane) and ex. 80, p. 2; Ex. 85, p. 3, §j; Exs. 86 and 87.) Moreover, additional issues were raised in these discussions concerning a valuation of the company, the possible transfer of ownership of the shares in the company held by the Donald Varney Trust that could potentially be inherited by Richard in the event he were to survive Donald’s widow Harriet (which he did not do) and the issue of retained earnings by the corporation and the use of the drawing accounts. The divorce proceedings were still pending but unresolved when Richard died on March 23, 1992. After Richard’s death, Linda became chief executive officer of Varney Bros.
50.Since that time, Linda has fulfilled the role of chief executive officer of Varney Bros. Linda has performed all of her duties as chief executive officer, as well as sales and marketing, negotiating, and other duties not typically considered to fall within a chief executive officer’s responsibilities, to the full satisfaction of the Board of Directors. She has determined the direction the corporation’s business would take; she has supervised all other management personnel; she has represented the corporation to government agencies with which it deals; she has exercised decision-making authority with respect to major capital purchases and with respect to sale or other disposition of real estate owned by Varney Bros.; she has presided at meetings of the Board of Directors; and she has exercised decision-making authority with respect to the corporation’s successful defense of claims brought *404 against it by a creditor of Richard.[15] She has, in addition, participated personally in labor negotiations with the union[16] representing Varney Bros.’s non-management employees; directly supervised the company’s sales force; personally engaged in negotiations with actual and prospective developers of Varney Bros, real estate; and personally engaged in substantial marketing activities for the corporation. She has worked more hours for the corporation than traditionally considered “full-time” since before Richard’s death. Linda has preserved Varney Bros, as a family corporation consistent with the wishes of its founders and shareholders. During Linda’s tenure, more than $500,000 in dividends have been paid to or for the benefit of each major shareholder of Varney Bros. (Ex. 130.) She has, in accordance with the wishes of the Board of Directors when it authorized her employment contract, and consistent with Richard’s hopes, brought Jon into corporate management and begun grooming him for eventual succession to a leading role in the management of the company.
51. The directors of Varney Bros, knew before they voted to approve the Employment Agreement that Richard, in the context of his divorce proceedings with Linda, had been attempting to negotiate an employment contract whereby Linda would remain at the corporation in the position of President, and that he wished her to have an employment contract and to remain actively involved in management of the corporation. The directors were generally aware that their negotiations included discussions of proposals for participation by Linda in profits of the corporation but not of all details of the negotiations between Richard and Linda. The directors who negotiated and authorized the employment agreement with Linda knew that no final employment agreement had been reached between Richard and Linda.
52. While the terms on which Linda might have been willing in 1991 or earlier to be employed by Varney Bros, included a five-year term beginning at $1,000.00 per week, the circumstances were significantly different before Richard’s death from those faced by the company and Linda as a result of Richard’s death. Notwithstanding his physical limitations, there is no evidence that suggests, during the divorce negotiations, that Richard planned to significantly lessen his involvement as the controlling manager of the corporation, whether as shareholder, officer, or director, a situation which would have caused Linda’s responsibilities, while Richard lived, to be substantially less intensive and burdensome to her, and likely less important to the overall success of the corporation and its shareholders than they became after his death. The nature of the position into which Linda found herself after Richard’s death proved to be substantially different from that which they had been discussing during their divorce negotiations. Since Linda was not a shareholder but had been married to a majority owner with whom she had shared both benefits, indirectly, and responsibilities, directly, in corporate profits which she assisted in achieving during his lifetime, Richard’s death, by definition, would require a substantial change in the manner in which Linda would receive compensation. Moreover, his death created conditions of uncertainty and concerns for the success of the business and for the succession of management that differed substantially from the situation when he was alive, thus enhancing Linda’s value and need to the corporation and its shareholders. Therefore, I find that the terms that Linda might have been willing to accept prior to Richard’s death neither conclusively establish what terms were fair and reasonable to the corporation after his death nor should they serve as a baseline for negotiations on an employment contract. The financial considerations, motivations and strategies that Richard and Linda may have held or employed during divorce negotiations were materially different from those that they might have held or employed had the subject of an employment contract been the only issue between them. I find that even if Linda had not disclosed to the board the details of her divorce negotiations with Richard, especially as concerns her willingness to work for less compensation as a result of negotiations which were a part of a broader proposed divorce or separation agreement, including the division of property, it was not material to her duty as an officer and/or director nor to the decision of the board.
53.Four directors — Jerrier, Shelley D. Vincent, III, Jon, and Linda — voted to approve the Employment Agreement between Varney Bros, and Linda. While Linda was clearly not disinterested in this decision, at least two of the remaining three directors were disinterested: Shelley Vincent, III and Jerrier. Even assuming that Jon was immediate family to Linda and financially dependent upon her while he remained a student and living at home with her, he is not necessarily conflicted over such a decision as would have disqualified his vote. Notwithstanding these actual or potential conflicts, however, and even if they had abstained, a majority of eligible directors voted to approve the contract. While Shelley Vincent, III and his father have long been associated with Varney Bros, and friendly with Linda, he was not under Linda’s control, he was financially disinterested and was not conflicted. Jerrier, while obviously subordinate to Linda as an employee, was an officer elected by the board of directors and a director elected by the shareholders; for neither position was she dependent upon Linda, as she first came to Varney Bros, in 1983, at the request of Richard and I infer that it was Richard who nominated her to these positions in 1987. Jerrier had no financial interest in the Employment Agreement and I find that she acted independently of Linda in voting to approve it, sincerely believed that it was in the best interest of the corporation to do so, and affirmatively sought such a contract to be made.
*405 54. While the directors recognized that Linda’s training, education and employment experience would not compare favorably to others managing similarly-situated companies, they knew, from their longstanding working relationships with Linda and Richard, of Linda’s history with Varney Bros., her familial relationships with the shareholders of Varney Bros., the services provided and responsibilities she fulfilled at the corporation, as well as her education, background, character, loyalty to the company and her abilities. They decided, with reason, that these characteristics, together with her willingness to serve as chief executive officer when no other family member was willing or able to do so, as well as her standing in the community and her interest in the survival and success of the company overcame any perceived deficiencies in her background and experience to manage a business of this size and qualified her to hold the position of chief executive officer of the corporation. I do not credit the testimony of Ellis’s expert witness Edwin Mruk to the effect that Linda’s modest educational background and her lack of business experience outside Varney Bros, do not justify the compensation paid to her or that her services to the corporation are not the substantial equivalent of the value of other chief executive officers to comparable companies. I find that the achievement of goals set by the Board of Directors, her success over the length of her contract in improving Varney Bros.’s overall performance, Varney Bros.’s payment of substantial dividends during her tenure to or for the benefit of its stockholders, her hard work and commitment to the corporation at a time when no shareholder was able or willing to take responsibility for it, and her long experience with and knowledge of the corporation, show the value of her services to the company. The plaintiff has not shown that Linda’s services have been of less value to Varney Bros., therefore justifying less compensation, than those reasonably expected from the average of chief executive officers of similar corporations, especially given the special circumstances present here.
55. When the Employment Agreement was being discussed and executed, only one year after the death of the company’s manager of long standing, I find that the directors reasonably perceived a need to demonstrate stability and continuity, to reassure both company employees and customers that the company would continue in business and believed that Linda’s continued service to the company would be the most effective means to demonstrate their intent to continue to conduct business as normal. The directors also believed, with reason, that loss of employees to other companies would damage Varney Bros.’s business and that Linda’s continued presence as chief executive officer of Varney Bros, over a substantial period of time would prevent loss of employees and erosion of its business in a regionally competitive market.
56. In addition, the directors deemed it important and intended to give Linda a substantial incentive to devote significant time, energy and attention to accomplishment of real estate transactions that could be highly profitable to the corporation and its shareholders. It was the directors’ expectation that the potential for profits to the corporation was strong, notwithstanding a downturn in real estate values, and that Linda should receive significant “additional compensation” payments, primarily as a result of successful accomplishment of such transactions. The directors expected such transactions would take years to accomplish, however, and that, therefore, Linda would not receive substantial awards of “additional compensation” in every year of her contract. Moreover, because the directors’ approval was required for any substantial real estate transaction, the directors retained ultimate control over whether Linda would receive such “additional compensation.”
57. Negotiation of the Employment Agreement took place between Paul Kane, the attorney who Linda had retained to represent her in the divorce proceedings, and Shelley Vincent. These negotiations were not in the traditional sense of extensive proposals and counterproposals, however. Unfortunately, of these two individuals who would likely be the most knowledgeable about the negotiations, Shelley Vincent, III is now deceased, and Attorney Paul Kane was not called to testify. There is, therefore, a significant lack of evidence as to which party opened the negotiations with a proposal, and whether the opening proposal was substantially different than that ultimately agreed. Shelley Vincent and Jerrier had had the benefit of working closely with both Richard and Linda and had the benefit of knowing Richard’s trust of Linda and his high regard of her worth to the company. Indeed, Jerrier testified credibly that she believed Richard had expressed a wish for her to have a written employment agreement with a ten-year term of employment. Jerrier thought that it was she who suggested a salary of $78,000.00 per year, since Richard had always received a base salary well in excess of that amount, sometimes exceeding $300,000.00, and that she deemed it important to include a non-competition clause, notwithstanding that there was no evidence that Linda had any interests, business or otherwise, that conflicted with those of Varney Bros. Again, unfortunately, there was no one who could recall the origin of the bonus income provision, although it is reasonable to infer, and I do infer, that it was suggested by Linda’s attorney.
58. The Employment Agreement, effective June 1, 1993, and for a term of ten years, contains the following provisions relevant to this action:
(a) Linda would hold the offices of President and Treasurer of Varney Bros., but she agreed that at all times during her employment she would, to the *406 best of her ability, energy and skill, perform all duties required of her by the Board of Directors;
(b) Linda’s base salary was $78,000 per year, to be reviewed annually by the Board of Directors for the purpose of providing additional compensation as it deemed appropriate bearing in mind comparable salaries paid to similarly situated executives. In no event was her salary to be less than $78,000 per year;
(c) Linda was to receive as “additional compensation” an amount equal to 25% of the “net profit” of Varney Bros.’s business, with “net profit” defined as the sum of (a) pre-tax income, (b) depreciation, amortization, and other non-cash expense items, and (c) interest expense on indebtedness;
(d) Linda was to be reimbursed her reasonable business-related expenses, to be provided with the expense-free use of a new automobile every three years, and to be reimbursed for a country club membership and related expenses;
(e) Varney Bros, was to pay for a $1,000,000 life insurance policy to be owned by Linda. The whole life policy was to be fully paid up over the 10-year term of the contract;
(f) Linda was to be entitled to participate in retirement, health, disability and other employee benefit plans in accordance with their terms, but Varney Bros, was under no obligation to establish such plans;
(g) Linda was entitled to four weeks paid vacation each year;
(h) Linda was prohibited, for a period of two years after she left Varney Bros.’s employ for any reason, from participating in any business that competed with Varney Bros, within the geographical area where Varney Bros, conducts its business.
59. Due, in part, to chronic cash flow problems, the directors who voted to approve the Employment Agreement wished to pay a relatively modest salary. The $78,000 starting annual salary established by the contract was substantially below market norms for like positions in comparable companies, substantially below the amount that Richard had customarily been paid, and was not an unreasonable amount under the circumstances. (Ex. 74; 135.) The directors retained full discretion under the contract as to any salary increases in subsequent years of the contract, as the contract contains no provision for automatic salary increases and no requirement that any salary increases be granted. (Ex. 4, §2.)
60. The Employment Agreement also required Varney Bros, to pay $25,750 per year in premiums for Linda’s $1,000,000 life insurance policy. In evaluating the reasonableness of Linda’s base salary, and the fact that the company is not a beneficiary, it is commercially reasonable and necessary to include this cost as additional “salary.” The provision for a $1,000,000 life insurance policy is appropriate in a chief executive officer’s contract so long as the cost to the corporation is considered as compensation to the executive and does not cause total compensation to be excessive. Even when added to the $78,000 starting salary established by the contract, this $25,750 annual insurance premium does not render her base pay excessive when compared with market norms for similar positions in comparable companies, and a company-paid, $1,000,000 life insurance policy for Linda was fair and reasonable to the corporation.[17] The amounts paid to Linda each year in salary and insurance premium (exclusive of bonus and long-term pay) have generally not exceeded amounts similar companies paid their chief executive officers. (Ex. 74.)
61.Linda’s salary plus insurance premium payment for the years since 1993 are as follows:
1993 $106,359
1994 $108,349
1995 $113,842
1996 $116,484
1997 $124,708
1998 $134,858
1999 $146,691
2000 $154,881
2001 $159,401
2002 $161,338
(Exs. 134; 74.)
62. The provisions in the Employment Agreement with respect to reimbursement of expenses, use of a company car, vacation, country club expenses, and participation in employee benefit plans typify market norms for chief executive officers’ contracts in corporations generally comparable to Varney Bros.[18]
63. A ten-year term for such a contract is highly unusual and beyond that standard in the marketplace. Such a term is not unreasonable, per se, however, given unique circumstances, such as those present here in 1993. A longer term than customary may be appropriate where a significant need exists for stability in top management of the corporation, such as that presented to the board herein where a dominant owner/manager of the corporation has died, where more time is needed to “groom” his chosen, long-term successor to assume management responsibility for a family corporation, and where a corporation’s financial condition and the plan to improve it requires long-term consistency in management. Jon Varney was a 20-year-old college student when the Employment Agreement was executed. He was neither mature nor experienced enough at that time, nor ready to assume the responsibilities of chief executive officer of Varney Bros. The directors hoped that by retaining Linda in the position of chief executive officer for ten years they would make it possible for Jon Varney to obtain the knowledge and experience necessary for him to assume significant responsibility for Varney Bros.’s management, thereby keeping corporate management in the Varney family.
*407 64. The directors who voted to approve the Employment Agreement also believed that Varney Bros.’s future success depended in significant part on continuing to develop and/or sell parcels of the corporation’s surplus real estate that were not used nor deemed necessary to its concrete business. Prior to Richard’s death, since at least the mid-1980s, Varney Bros, had been interested in selling or developing some of the corporation’s extensive unused real estate holdings on terms that would be profitable to the corporation. In 1986 and 1991, he entered into option agreements for the Depot Street property and for the sale of property that later became the Stallbrook marketplace at the northeast quadrant of the intersection of Route 495 and Hartford Avenue in Bellingham. Although it was Richard who primarily conducted the negotiations of the business terms and made the decisions regarding the 1986 and 1991 Depot Street option agreements and the agreement by which the Corporation sold the northeast quadrant land to a partnership established by the Weiner group and, while Linda’s role was not significant, she assisted and acquired invaluable experience from working with him in those transactions.
65. The directors who voted to approve the Employment Agreement believed, with reason, that a ten-year term was necessary to accomplish further profitable development or sale of selected parcels of corporate real estate due to the poor condition of the real estate market at that time. The directors believed it would be advantageous to the corporation if the person responsible for negotiating appropriate real estate transactions remained in office long enough to provide stability to the management of the company while permitting the market to rebound and that a substantial period of time would likely be needed to negotiate and execute profitable real estate transactions under these economic circumstances.
66. In consideration of the unique circumstances confronting the company and the corporate purposes the directors hoped to accomplish, the ten-year term of the Employment Agreement was fair and reasonable to the corporation and was a reasonable exercise of the directors’ business judgment.
67. The Employment Agreement provides for Linda to receive 25% of the corporation’s “net profit” as “additional compensation” at the end of any fiscal year in which the corporation makes a “net profit.” Linda and the board have interpreted this 25% “net profit” bonus compensation provision to include profit from the sale of the corporation’s land or other assets. The contract contains no other provision for a bonus. (Ex. 4.) The 25% “additional compensation” provision was intended by the directors who voted to approve the employment contract as an incentive provision in the nature of a bonus to further the corporate goal of liquidation or development of its real estate holdings deemed unnecessary to its core business. Remuneration to a chief executive officer often includes a provision for so-called long-term pay, either in the form of annual awards of stock or stock options or, in corporations in which issuance of stock or stock options is not feasible, in other forms which provide benefits comparable to those that would be derived from stock ownership. The contract between Varney Bros, and Linda contains no provision of any kind for long-term pay other than this 25% incentive bonus.
68. On the surface and in theory, before consideration of the actual formula or percentage amount agreed, without a ceiling, it is viewed as comparably more favorable to the company’s interest to pay such a bonus since it must be first offset by potential operating losses before any liability to pay Linda on this bonus actually arises, than would a bonus based solely upon a share of proceeds from the sale of company-owned real estate, a bonus that would accrue in spite of the company’s operating performance.
69. There is considerable variety among the bonus plans utilized by corporations generally comparable to Varney Bros, to compensate their chief executive officers. While bonus provisions based on achievement of pre-set “benchmarks” are common in large corporations, they are relatively uncommon in small, closely-held corporations, due to the fact that small, closely-held corporations do not typically have the need or the resources to establish and monitor performance benchmarks. Provisions that calculate bonus payments as a percentage of salary are less appropriate where, as here, the executive is paid a relatively low salary.
70. Bonus provisions that provide for payments based on corporate profits, as does the “additional compensation” provision herein, are common. Bonus plans that do not contain a “cap” on the dollar amount that may be awarded are not uncommon, and published data indicate they are utilized by a substantial minority of companies. Uncapped bonus plans may be appropriate where, as here, the amounts on which the bonus will be calculated are not readily predictable and where, as here, there is a wish to give the executive an incentive to maximize profit to the corporation.
71. Consequently, in addition to salary and insurance premium payments, Linda has also in most years been paid (or received promissory notes for) “additional compensation” in varying amounts. (Ex. 134.) Linda’s total direct compensation, including salary, life insurance premium payments, and “additional compensation,” compared to salary, bonus and long-term pay received by chief executive officers of companies generally comparable to Varney Bros., are as follows:
*408 YEAR LINDA MARKET NORM
1993 $106,359 $215,100
1994 $124,130 $224,800
1995 $133,185 $235,000
1996 $116,484 $245,600
1997 $177,414 $256,700
1998 $639,050 $268,300
1999 $185,255 $280,400
2000 $190,733 $293,000
2001 $244,631 $247,400
2002 $161,338[19] $236,300
(Ex. 135.)
72. When Linda’s base salary plus insurance premium payment for the years since 1993 are compared with her total direct payment after bonus income is accrued, the difference is as follows:
Salary (plus Ins.) Salary (plus ins.) and bonus bonus
1993 $106,359 $106,359 0
1994 $108,349 $124,130 $15,781
1995 $113,842 $133,185 $19,343
1996 $116,484 $116,484 0
1997 $124,708 $177,414 $52,706
1998 $134,858 $639,050 $504,192
1999 $146,691 $185,255 $38,564
2000 $154,881 $190,733 $35,852
2001 $159,401 $244,631 $85,230
2002 $161,338 $161,338[20]
(Exs. 134; 74.)
73. During Linda’s tenure as chief executive officer, Varney Bros, has lost money most years.[21] In 1992, the first year of her tenure but prior to the employment contract, Varney Bros, had an operating loss of about $555,000, but total income of about $1,180,000 because of a real estate transaction consummated early that year. In 1993, Varney Bros, had an operating loss of about $400,000 and an overall loss of about $330,000. In 1994, Varney Bros, had an operating loss of about $206,000 and an overall loss of about $175,000. In 1995, Varney Bros, had an operating loss of about $132,000 and an overall loss of about $95,000. In 1996, Varney Bros, had an operating loss of about $518,000 and an overall loss of about $468,000. In 1997, Varney Bros, had an operating loss of about $262,000 and an overall loss of about $95,000. In 1998, Varney Bros, had an operating loss of about $558,000 but an overall profit of nearly $2,000,000 attributable to its real estate ventures. In 1999, Varney Bros, had an operating loss of about $511,000 and an overall loss of about $13,000. In 2000, Varney Bros, had an operating loss of about $503,000 and an overall loss of about $97,000. In 2001, Varney Bros, had an operating loss of about $263,000 and an overall profit of about $209,000 attributable to its real estate ventures. Therefore, from 1993 through 2001 Varney Bros, has realized almost $1,000,000 in overall profits and an overall increase in gross revenue after a sharp decline from 1988 to 1993. (Ex. 117, tax returns for 1992 through 2001.)
74. The overall profit realized by Varney Bros, in the later years of Linda’s contract reflect the results of real estate transactions which have occurred under her watch, most significantly the so-called Charles River property. The large profit in 1998 reflected cash paid for the real estate Varney Bros, contributed to that project. Improved overall results, i.e., either actual overall profit, or sharply lower overall losses in comparison with losses from operations, in the years since 1998, largely reflect the stream of income generated by that project, the earlier-completed Stallbrook project, and option agreements with respect to other parcels of real estate. (Ex. 76-79; Ex. 117, tax returns for 1998 though 2001.)
75. Accomplishment of real estate transactions favorable to the corporation, especially those structured to provide an ongoing stream of income to the corporation, was a principal goal established for Linda by the Board of Directors when it authorized the Employment Agreement with her. While the Corporation has consistently lost money from its concrete operations each and every year from at least three years prior to Richard’s death through 2002, Varney Bros, has substantially improved its economic condition and overall performance during her tenure by virtue of these real estate transactions, and has overall been profitable during her tenure.
76.A “bonus” or “additional compensation” plan that pays 25% on net profit inclusive of real estate sales proceeds included the likelihood that if it were actually accrued, its generation would be most likely due to the sale of company-owned real estate, considering the history of Varney Bros.’s earnings from operations. Therefore, while it does provide an incentive to meet the company objective to diversity by sale and/or development of its surplus real estate, in the view of this court, such a value is far outweighed by its prejudice to the company and its shareholders, as it allows the recipient to share in the liquidation of an appreciable capital asset from its first dollar of value without restriction and without any reasonable basis for entitlement to such a reward. This is viewed as tantamount to a gift of 25% of whatever value that the asset had acquired prior to any involvement of the recipient in the appreciation of the asset, if any, and any contribution by the recipient in the appreciation of that value. Such a financial incentive is seen as placing the recipient in a position at least similar to, if not preferred over that of a shareholder. Moreover, since Linda would now be unable to share in Richard’s income or dividends derived from his interest in the corporation, by virtue of his death and her lack of shareholder standing, this 25% bonus, given the inclusion of proceeds from the sale of corporate real estate, appears to be, in function, similar to a division of property which Linda and Richard had been *409 negotiating during their divorce proceedings, and less equitable to the company than that to which Richard may have been willing to agree as part of their divorce if even within his power to give.
77. Notwithstanding the oversight that the board of directors retained over the ultimate decision to sell the company’s surplus real estate, and that the sales and development agreements that were entered into on behalf of Varney Bros, also favorably include a continuing stream of income for the company from related construction activities and from a share of the rental income of the completed projects even beyond the sale of the land, through the medium of limited partnership, the evidence did not demonstrate that the company had widely marketed the property or taken any of the customary steps available to generate a competitive interest in its land holdings. While the end results may have been shown to be commercially satisfactory from the perspective of the company, the evidence did not show that efforts by Linda were instrumental to the transactions. Indeed, the evidence showed that, as an example, with respect to the Charles River sales and development agreement, she could not specifically recall any salient points of disagreement or how the original proposals submitted to her differed from the final agreement, if at all, although she could recall a wetlands issue that needed to be resolved that involved the U.S. Army Corps, of Engineers. She was not able to describe any negotiation activity concerning the transaction that occurred prior to October 26, 1995, but apparently the business terms of the agreement were concluded relatively quickly, possibly as soon as a week later, by November 2,1995. There was no evidence that she directed the company to order an appraisal of the Charles River land before she agreed to sell it, and she based her decision to sell the land generally upon what she believed the Weiner group paid for a similar, though smaller, property.
78. Edwin Mruk, the plaintiffs expert, with over 40 years of experience as a consultant in the field of executive compensation, presently advises management in the field of closely-held businesses and partnerships. He has had extensive experience with the conduct and analysis of surveys of executive compensation in the early 1970s as a partner at Arthur Young. In his experience, he has never seen an employment contract giving a CEO an unrestricted percentage of net profit from the sale of corporate assets. He testified, with some logical appeal, that if a bonus is to be paid in connection with a sale of assets, the method he believed most generally accepted and commercially reasonable is to set a baseline value based upon an initial appraisal and to pay a bonus only if a sale is achieved at a price higher than the appraised value, and if so, to calculate the bonus only upon the difference. I credit Mr. Mruk’s testimony on this point. Although I find, in general, that a bonus compensation of 25% of profits is not necessarily unfair, given the circumstances here, such a provision of the agreement, if measured against profits that includes the net proceeds from the sale of corporation assets such as real estate, is unfair to the corporation without a baseline floor or ceiling.
E. Linda Varney’s drawing account
79. In June 1991, Richard and Linda decided to withdraw $200,000 from his drawing account and $100,000 from her account. These withdrawals were for the purchase of three $100,000 CDs, one in the name of Richard, one in the name of Linda and the third to be in their joint names. The company ledger was adjusted accordingly.
80. In 1992, Varney Bros, and the Estate of Richard Varney were involved in litigation over an employment agreement that Richard had made with Rose Champagne, a woman who had acted as his nurse during the last years of his life. In 1994, shortly before the trial of the case, her attorney requested that the Estate produce an accounting of its current assets. Following this request, Jerrier made adjustments to Richard and Linda’s drawing account, or promissory note, balances. One adjustment was to reflect a further decrease of $100,000 to Richard’s drawing account balance and a corresponding $100,000 increase to Linda’s drawing account balance that I find was made in order to reflect that the 3 CDs were paid for by Richard. In a note to Linda dated January 13, 1994, Jerrier wrote in relevant part that she “turned the RCV Account papers over to Bart. The changes I made basically involved the following: ... 4. The three $100,000 withdrawals for CDs (one for RCV, one for LLV and a joint one at Ben Franklin to RCV.LLV) have all been deducted for [sic] RCVs account.” (Ex. 45.) Jerrier’s reference to “Bart” in the note is to the defendant Molloy, who was acting as the attorney for the Corporation and the Richard Varney Estate.
81. Sometime later in 1994, Shelly Vincent, the Trustee of the Richard Varney Trust, instructed Jerrier to reverse the $100,000 adjustment made to the Richard Varney drawing account balance. Jerrier made that adjustment and Richard’s drawing account balance was increased by $100,000. Jerrier received no such instruction to reverse the $100,000 increase to Linda Varney’s drawing account balance, and the evidence does not show that she made an entry to reverse this improper increase. This results in $100,000 in additional funds available to Linda in her drawing account to which she is not entitled. Jerrier’s testimony to the contrary is not credible, not only because she produced no document to substantiate any reversing entry but because the accounting she did make supports the opposite conclusion.
IV. Facts specific to the plaintiffs direct claims
A. The shares due the plaintiff from the Clarence Varney Trust
82. Upon Richard Varney’s death on March 23, 1992, Ellis, Jon and Elizabeth Varney became the present beneficiaries of the CEV Trust. (Exs. 56, 59.) *410 The assets in this trust at the time of Richard’s death consisted principally of 135 shares of Varney Bros, stock and 1260 shares of Milford National Bank and Trust Company stock. (Ex. 43.) Both Varney Bros, and the Milford were closely held corporations. There was no established market or market price for their shares.
83. At the time of Richard’s death, the Milford was the trustee of the CEV Trust and Shelley D. Vincent, III was the bank officer with responsibility for the trust. Linda has never been trustee of the CEV Trust and has never had responsibility for management of that trust.
84. In addition to its responsibilities with regard to the CEV Trust, in March 1992, the Milford became the executor of the Richard Varney Estate and trustee of the Richard Varney Trust. In those capacities, the Milford had the legal responsibility to use its own discretion as to how to use the funds of the Estate and the Trust to benefit the beneficiaries of Richard Varney’s Trust, including Ellis. (Ex. 11.)
85. Since the incorporation of Varney Bros, in 1951, through early 1996, when Mr. Vincent resigned his position on the board of directors of the Corporation, a member of the Vincent family, either he or his father, Shelley Vincent, Jr., has always been a member of the Varney Bros, board of directors. The elder Mr. Vincent, a good friend of Clarence and Donald, was one of the incorporators of Varney Bros. Sand & Gravel, Inc. (ex. 1), and its first clerk. Shelly Vincent, III became assistant clerk of the corporation in approximately 1979, and he succeeded his father as a director and clerk of the Corporation in 1987.
86. Since the Vincent family first acquired an interest in the Milford, a member of the Varney family has always sat on the bank’s board. Linda became a member of the Milford’s board of directors shortly after Richard died, and she has retained that position continuously since that time. After Richard died, she also assumed control of the Varneys’ major interest in the Milford’s stock.
87. A provision in the codicil to Clarence Varney’s will, executed in 1970, provided as follows:
Upon any grandchild attaining the age of twenty-five (25) years (twenty-one (21) years as to a grandchild born after my death), I direct that my Trustee pay over one-half (½) of said grandchild’s share of the Trust Estate and upon said grandchild attaining the age of thirty (30) years (twenty-one (21) years as to a grandchild bom after my death), I direct that the remaining one-half (½) of said grandchild’s share be distributed to her or him free of all Trust.
(Ex. 2, first page of codicil.) Of Clarence’s three grandchildren, only Ellis had attained the age of 30 years at the time of Richard’s death, with Jon being almost 19 and Elizabeth almost 15.
88. From the very beginning of his management of the affairs of the CEV Trust after Richard died, Mr. Vincent made it clear that he intended to distribute to Ellis the 45 shares of stock held in the CEV Trust for her benefit, as soon as practicable. Ellis was over 30 years old and, under the terms of the CEV Trust, was entitled to receive 45 shares of stock in the Corporation free of trust. (Ex. 2.) On March 30, 1992, Mr. Vincent wrote to the CEV Trust’s attorney, Howard Medwed, that “Jane has attained age 30, and, therefore, her V3 share will be distributed to her in the foreseeable future.” (Ex. 36, page 1.) On April 16, 1992, he met with Mr. Medwed and the Corporation’s accountant, Stephen Bonder, at which he took notes that state, “Of course, Jane gets her V3 of the sh[are]s.” (Ex. 35, page 2.)
89. However, Vincent was aware of two technical complications which he believed required resolution prior to any distribution. The first concerned the status of Varney Bros, as a “subchapter S” corporation. Shelley D. Vincent, III determined that in order to preserve Varney Bros.’s status as a Subchapter S corporation, it was advisable to transfer the 135 shares of Varney Bros, stock held in the CEV Trust into three voting trusts, the Jane Ellis Voting Trust, the Jon Varney Voting Trust, and the Elizabeth Varney Voting Trust. Vincent caused voting trust documents to be prepared and, in May 1992, the Milford National Bank and Trust Company as trustee of the CEV Trust transferred 45 shares of Varney Bros, stock to itself as trustee of the Jane Ellis Voting Trust, 45 shares to itself as trustee of the Jon Varney Voting Trust and 45 shares to itself as trustee of the Elizabeth Varney Voting Trust. (Exs. 36, 39, 107.) Vincent so informed Linda of the creation of the voting trusts and of the reason for creating them. Linda relied upon Vincent’s expertise as an attorney and professional fiduciary, accepted his advice and played no role in his decision or their creation. While there is evidence that Vincent did not obtain Ellis’s assent to creation of the Jane Ellis Voting Trust there is no evidence that Linda was aware of this omission or had reason to know of any such failure, until after Ellis and her attorney, Christine Burke, learned of it in 1994 and expressed objection to the voting trust. (Ex. 106.)
90. Related to the issue of the voting trust was inheritance taxes due on account of the CEV Trust in connection with the death of its life beneficiary, Richard. In August 1992, Shelley D. Vincent, III informed Linda that he estimated the amount of the tax at $289,478. He informed her that the tax payment was due by September 23, 1992, that he thought an extension of time for making the payment could be obtained, but that if an extension of time was obtained the trust would have to pay interest on the amount owed at the rate of 10% per annum. The trust did not have cash with which to pay the tax or readily marketable assets to sell to raise the cash. Vincent advised Linda of his view that the tax should be paid by September 23, 1992, to avoid incurring interest obligations. He further advised Linda that the most *411 appropriate way to raise the cash to pay the tax would be for the trustee to borrow from Varney Bros. (Ex. 37.)
91. The amount of inheritance tax due was ultimately determined by Shelley D. Vincent, III to be $223,089. In accordance with Vincent’s advice, Varney Bros, loaned that amount to the CEV Trust and received in return a promissory note from the trust. The note bore interest at the rate of 10% per annum. (Exs. 38, 39.)
92. Vincent also informed Linda in August 1992, that, ordinarily, a beneficiary’s share of trust assets would be distributed only net of the beneficiary’s share of any debt, with trust assets being sold if necessary to raise the cash needed to discharge the debt. It is reasonable to infer that Vincent knew of the customary practice among fiduciaries not to distribute the assets of a trust so long as there remains a debt payable out of the trust assets. Because Vincent had determined that assets in the CEV Trust would not be sold to raise cash to discharge the promissory note to Varney Bros., and anticipated that the debt to Varney Bros, would eventually be discharged by the trust using cash from distributions on the 135 shares of Varney Bros, stock in the trust (exs. 37, 39), he advised Linda that any distribution of Varney Bros, stock to Ellis would need to be subject to her assumption of the obligation to repay the portion of the debt attributable to her share of the inheritance tax. Notwithstanding Vincent’s statement to Linda that he expected to distribute Ellis’s share of the assets of the CEV Trust to her on or shortly after December 31, 1992, and wrote that “Jane’s share of the loan . . . would presumably be paid over time from distributions made by the company upon the common stock” (ex. 37), the trust did not distribute Ellis’s share of the trust assets on or shortly after December 31, 1992.
93. On September 23, 1992, Mr. Vincent paid the inheritance tax and wrote in his cover letter to the Mass. DOR that “(o]ne grandchild, Jane Ellis, has attained age 30, so that her one third share is to be distributed to her outright, free of trust.” (Ex. 38, page 1.)
94. In September 1993, Christine Burke, an attorney representing Ellis, met with Linda and an accountant, Stephen Bonder, to obtain information concerning Ellis’s interests in Richard’s estate and in the CEV Trust. Bonder was the accountant both for Varney Bros, and for the CEV Trust. Ellis herself did not attend the meeting. Burke was told at the meeting about the Jane Ellis Voting Trust. She was also told that Ellis had signed a promissory note and security agreement with respect to Varney Bros, shares held by the CEV Trust.[22] Linda told Burke that information relating to the Jane Ellis Voting Trust and relating to Varney Bros, stock held by the CEV Trust was in the possession of Shelley D. Vincent, III and Howard Medwed, and referred her to those two men for the information. (Ex. 120.)
95. On or about December 10, 1993, Ellis’s attorney wrote to Shelley D. Vincent, III and to Howard Medwed asking, among other things, for copies of Varney Bros.’s corporate minutes for the period 1990 to 1992 that concerned Varney Bros, stock held by the CEV Trust “which were used as collateral on a loan to [sic] the corporation,” documents related to the Jane Ellis Voting Trust, the promissory note Burke believed Ellis had signed, and the security agreement she believed Ellis had signed with respect to Varney Bros, stock. (Ex. 120.)
96. On December 17, 1992, Howard Medwed provided Burke with unsigned drafts of the requested voting trust documentation but told her he was not the keeper of Varney Bros.’s corporate records and therefore did not have copies of corporate documents related to the voting trust. (Ex. 125.) On December 28, 1993, Shelley D. Vincent, III provided Burke by letter with executed copies of the voting trust documentation and the requested corporate minutes. Vincent told Burke that there had been no security agreement executed with respect to the Varney Bros, stock in which Ellis had an interest, in effect telling her that he, as trustee borrowed funds from the corporation upon an unsecured note to enable the trustee to pay inheritance tax due on the future interests on account of death of Richard C. Varney, and that the obligation would remain outstanding the loan could be repaid from the only likely source available to the trust, namely upon distribution of the Varney Bros, shares. He noted Ellis’s liability, on account of her interest in one-third of the trust, to repay her share of the obligation after the shares are distributed to her. Finally, he spoke of his plan of distributing the shares to Ellis free of the voting Trust as soon as the tax liability was finally settled with the Massachusetts Estate and Inheritance Tax Bureau.[23] Vincent sent Linda a copy of the letter he sent to Burke. (Ex. 39.)
97. Burke replied to Vincent on February 3, 1994, and informed him that Ellis had not assented to creation of a voting trust in her name, did not assent to the trustee’s retention of the 45 shares of Varney Bros, stock distributable to her, denied the trustee’s entitlement to retain those shares, and demanded delivery of them to Ellis free of trust, “net of her share of the inheritance tax liability.” Burke sent a copy of her letter to Linda. (Ex. 106.) This, in turn, drew a response from Vincent on February 8, 1994, in which he stated that he had not intended to deny Ellis any rights, that he believed that the trustee owned legal title to the stock and therefore had the capacity to transfer the stock into the voting trust, that retention of the stock in the voting trust was necessary to protect Varney Bros.’s status as a Subchapter S corporation, and that the trustee could not distribute the stock until the debt for inheritance taxes was discharged. (Ex. 107.)
*412 98. The debt for inheritance taxes was not, in fact, discharged until early 1999. Varney Bros, realized a large profit as a result of the so-called Charles River real estate transaction in late 1998 and paid a dividend of $3,100 per share on its outstanding stock. (Ex. 130.) By the time the debt for inheritance taxes had been paid, however, this litigation had been commenced against, among others, the Milford as trustee of the CEV Trust. The Milford had, by that time, incurred legal expense in defending the litigation and anticipated additional legal expenses, of unknown magnitude, in the future, that it viewed as potentially reimbursable out of the assets of the CEV Trust. The Milford continued to hold Ellis’s Varney Bros, stock in the trust as collateral from which it could, if necessary, recover its legal expenses.
99. In September 2002, Ellis and the Milford reached a settlement of their differences and the 45 shares of Varney Bros, stock was distributed free of trust to Ellis. (Ex. 24.)
100. Although the plaintiff contends that Linda started to interfere with the Milford’s decision regarding the continued retention of the stock shortly after receiving Mr. Vincent’s letter of August 21, 1992, on the belief that Linda did not want Ellis to have voting participation in the corporation, there is no direct evidence that Linda was of such a state of mind and/or had communicated any such preferences to Vincent or the Milford. However, there is no evidence upon which it may be inferred that Vincent resisted the distribution of Ellis’s shares out of fear that the trustee would lack security on the debt to the corporation. While it is understandable why Mr. Vincent did not distribute to Ellis her stock shortly after December 31, 1992, as he told Linda he intended to do (ex. 37), given the uncertainty over the ultimate tax liability or the liability of the trust to the corporation on account of its loan of funds to the trust, the evidence does not explain why, when questioned by Attorney Burke, in the fall of 1993, Vincent did not tell Ms. Burke that Ellis would receive her stock so long as she agreed to repay the loan to the Corporation (ex. 106), or why, when demand was made by Burke to distribute the stock in February 1994, “net of her share of the tax liability,” Mr. Vincent did not offer to do so on the condition that Ellis guaranty repayment of the inheritance tax debt. (Ex. 107.) Indeed, it appears from the evidence that Ellis never denied liability to the trust for its tax or loan obligation, and that she was never asked to provide security against that liability, which was feasible, given a likely source of funds from anticipated dividends.
101. In a letter dated March 24, 1994, Mr. Vincent wrote Linda to memorialize the substance of a meeting that they had had earlier, which included among other things a discussion about Ellis’s stock and Mr. Vincent’s plan to distribute it. (Ex. 40.) Jerrier admits that she attended the meeting, and the first paragraph of Mr. Vincent’s March 24, 1994 letter confirms that fact. In the first paragraph, Mr. Vincent refers to a separate letter that he sent to Jerrier regarding the accounting for “Dick’s ‘drawing account.’ ”[24] Molloy’s invoice to Linda reflects a two-hour meeting with “L, B and SDV’ on March 16,1994, a couple of days before Mr. Vincent’s letter to Jerrier and eight days before his letter to Linda. (Ex. 108.) There is no evidence of any meeting among the same people during March 1994 other than the meeting referenced in Mr. Vincent’s two letters. I find that the meeting took place on March 16, 1994. At this meeting, and as reflected in the March 24, 1994 letter from Vincent to Linda sent to memorialize the substance of the discussion at the meeting, Mr. Vincent addressed the fact that it would be a considerable amount of time before the CEV Trust would resolve finally the inheritance tax debt with the DOR and an even longer time before the Corporation would make a distribution sufficient to pay off the inheritance tax debt. Mr. Vincent told the defendants that “we should plan to make a distribution to Jane of her 45 shares since I think that would go a long way toward avoiding further hard feelings and suspicions.” It is apparent, therefore, that he intended on distributing the stock to Ellis on the condition that she guaranteed payment of V3 of the loan to the Corporation, stating that the necessary paperwork would be drafted for Ellis’s signature giving the CEV Trust a security interest in Ellis’s stock. (Ex. 40.)
102. Linda testified that she had no memory of the March 1994 meeting with Mr. Vincent or any other discussion for that matter with Mr. Vincent about Ellis’s stock or Mr. Vincent’s plan to distribute the stock in March 1994. She acknowledged that the distribution of Ellis’s stock in the CEV Trust was none of her business. While that is true, the manner in which Mr. Vincent handled the issue of distribution of Ellis’s stock and Ms. Burke’s inquiries and the content of his communications with Linda, especially that of March 24, 1994, is suggestive that he considered the distribution of Ellis’s stock to be of interest to Linda and not welcome. There is no other likely reason apparent in the evidence to explain why, from late 1993, and early 1994, through his retirement and/or death, Mr. Vincent changed his mind from his stated intentions to distribute the stock to Ellis in response to Ms. Burke’s inquiries. I do not infer, from the fact that the Milford did not distribute stock to Ellis after Shelley D. Vincent, III from time to time indicated to Linda his intent to do so, that Linda encouraged him not to distribute the stock. Linda denied any such conduct and nothing in Vincent’s correspondence indicates she played a role in the decision making. To the contrary, it appears from the correspondence that Shelley D. Vincent, III alone was the decision maker with respect to how to handle the stock and did not defer his authority to any other person.
103. On April 29, 1994, Vincent spoke with Burke to advise that Ellis was going to get her stock, specifi *413 cally telling her that Molloy was going to release all of Ellis’s stock and that he (Molloy) was in the process of preparing the paperwork. In a note that she made contemporaneously with her conversation with Mr. Vincent, Ms. Burke wrote “4/29 Shelly Vincent said B. Molloy is releasing all the shares of stock and is in process of preparing documents. Warned that there is liab. attached to shares of which we must be aware. PC Jane.” (Ex. 119.)
104. Molloy did not release the shares to Ellis and he did not prepare the paperwork. Molloy gave no explanation for his failure to cany out Mr. Vincent’s instruction, except to say that he did not remember Mr. Vincent asking him to release Ellis’s stock or to prepare the paperwork so that she could get her stock. Molloy attended the March 16,1994 meeting at which, as it may be inferred from Mr. Vincent’s March 24 letter of the meeting, the parties discussed Ellis’s stock and the need to prepare the paperwork so that Ellis could receive the stock. Molloy sent a bill to Linda Varney, President of Varney Bros. Sand & Gravel, Inc. for the time that he spent in the March 16, 1994 meeting. (Ex. 108.)
105. This invoice also includes time that he spent discussing Ellis’s stock with Mr. Vincent; the itemization of the bill reflects a conference with Mr. Vincent on May 17, 1994 regarding Ellis’s stock. (Ex. 108.) On the cover page of the invoice, Molloy wrote to Linda that the bill relates to “litigation matters [with Rose Champagne], the probate of Dick’s estate and Jane’s stock.” (Ex. 108.) There is no direct evidence that Vincent gave Molloy any instructions to prepare the necessary documentation to secure the beneficiary’s liability to the trust which Molloy disregarded, whether to accommodate Linda’s wishes or any other reasons, nor that he did so at the instigation of Linda, notwithstanding that he was without a direct personal motive of his own; while he would not likely have suppressed a client’s instructions on his own initiative, the evidence is not so clear that such an inference is compelled or even reasonable.
106. What is clear in the evidence is that during the period of time from April 1994, to the summer of 1996, Mr. Vincent’s wife and Mr. Vincent himself were terminally ill, and Mr. Vincent was distracted from attending to his business concerns by these serious personal issues. By the summer of 1996, Mr. Vincent’s wife had died and Mr. Vincent himself was so ill that he had earlier resigned his position as a director of the Corporation with Molloy taking Mr. Vincent’s place on the board.[25]
107. Ms. Burke did not again inquire of the status of the stock until the summer of 1996, when she and Ellis met with Linda and Molloy at the Corporation’s headquarters sometime before August 1, 1996 (before Harriet Varney died) to discuss the stock and Ellis’s renewed request for a job with the Corporation. In response to this inquiry, Molloy did not make reference to any instructions that Mr. Vincent had or had not given him, did not acknowledge that Vincent had asked him to release the stock, and did not say that he would see that Ellis received her stock and the paperwork immediately; he stated that the stock could not be released because of the inheritance tax debt. It is apparent that Molloy did not know in the summer of 1996 about Ms. Burke’s April 1994, telephone conversation with Mr. Vincent. Ms. Burke testified that she did raise the subject with Molloy because she did not want to make the meeting confrontational.
108. Sometime between April and mid-September 1996, Molloy sent an invoice to the corporation, in care of Linda, for research into buy-out formulas, inferably regarding Ellis’s stock in the Corporation, and at Linda’s request, notwithstanding that Ellis did not ask to be bought out of the Corporation before Molloy conducted his research. (Ex. 91.) Indeed, she had expressed an interest on more than one occasion for employment by the Corporation. At the 1996 meeting, as she had in 1993, Linda declined Ellis’s request for a part-time job with the Corporation for reason that there was no position available for her and that she was not qualified to work for the Corporation. At the 1996 meeting, Molloy did the talking, and he repeated in substance what Linda had told Ellis back in 1993. Varney Bros, historically, however, had hired family members who asked for work, often, but not exclusively, during teenage student years. However, on short terms, many of Linda’s family worked for the Corporation at one time or another and neither she nor Richard had ever told a member of her family that he or she was not qualified to work at the Corporation. While Ellis did not request a specific position, I find that the request was made more for tax purposes, so as to be able to take advantage of passive loss rules, especially given the pass-through income to the shareholders of a subchapter “S” corporation. Except for a summer job when she was in high school, Ellis has never been employed by Varney Bros, and has never sought full-time employment with Varney Bros, or offered to work full-time for it. Except for that summer job, it was not until 1993 that Ellis sought employment of any type with Varney Bros.
109. Ellis has been employed, either part-time or full-time, by employers other than Varney Bros, at all times since well before Richard’s death, except when she chose to stop work for several weeks to devote full time to caring for her youngest child after his birth in 1994.
110. On August 1, 1996, Harriet Varney died and, as a result, Ellis became entitled to receive free of trust 50 shares of stock in the Corporation under the terms of the DAV Trust. (Ex. 3.) By that point in time, Linda was the Trustee of the DAV Trust, and likely knew that Ellis was entitled to receive 50 shares of stock in the Corporation sooner rather than later, because there *414 was no inheritance tax debt tied to the DAV Trust shares.[26]
111. In 1997, following the death of Shelley Vincent, III, the Milford assigned the management of the CEV Trust to Wendy Barker and Edward Dinaro, both of whom were officers of the bank and trust officers. Linda was known to them as a director of the bank and as a customer of the trust department who had an individual investment account. In November 1997, Linda met with Wendy Barker at the Milford National Bank and Trust Company and opened a “full discretion” corporate agency investment account with the Bank’s trust services department with a $500,000 initial deposit. (Ex. 32.)
112. Three months later, on February 3, 1998, Molloy, Linda and Jerrier arranged a meeting with Ms. Barker and Mr. Dinaro, her supervisor. Ms. Barker testified that Mr. Molloy did the talking, and that she spoke very little if at all. Linda testified that Mr. Dinaro didn’t say a word at the meeting. Molloy identified himself as the attorney for both Linda and the Corporation and that they wished to make them aware of certain information as may have an impact on the bank as the administrator of the Richard Varney estate and as trustee of the CEV Trust. Molloy discussed with Ms. Barker and Mr. Dinaro the Rose Champagne litigation, and the possible necessity to reverse a distribution that had been made from the Richard Varney Estate as against that exposure to liability. Also, Molloy explained the transaction regarding the funds which had been loaned by the corporation to pay the inheritance taxes due on account of the CEV Trust. In connection with that subject, Molloy proceeded to discuss Ellis, her divorce and the possible distribution of her shares. According to Ms. Barker, he referred to her in the context of the divorce as a “threat to the corporation,” concerned that corporate tax returns would be turned over to Ellis and her husband from which both would find out more about corporation and expressing a fear that Rick Ellis, her husband, would acquire shares in the corporation. According to Barker, Molloy said that he anticipated a lawsuit and that the Bank “will get a deposition” and that “Jane ‘could say’ [the Bank] took [her 45] shares” of stock being held by the Bank in the CEV Trust. He told Ms. Barker and Mr. Dinaro that the Corporation would make a distribution in the first quarter of 1998 sufficient to pay the promissory note so that the Bank could distribute the stock to Ellis. (Ex. 41, page 3.)
113. Following Shelley Vincent’s departure from the bank, it is clear that the management of the CEV Trust, by Barker and Dinaro starting in early 1997, as well as by Charles Ells beginning in August 2000, were independent of Linda, notwithstanding the investment activity she brought to them and her position with the bank. They described the efforts taken to ensure that there was no conflict of interest and that she was excluded from decisions of the bank as trustee of the CEV trust. I find Barker’s and Ellis’s testimony credible that the decision of the bank to retain the Ellis shares was due to their perceived need for security as against trust liabilities and not due to any involvement of Linda in their decision nor due to any encouragement by her for them to do so.
114. If the Milford breached fiduciaiy duties to Ellis, either in transferring the Varney Bros, shares distributable to her to a voting trust without obtaining her assent or in refusing until September 2002, to distribute those shares to her free of trust there is no evidence Linda was aware the Milford’s conduct constituted a breach of fiduciaiy duty or was otherwise wrongful. Moreover, there is no evidence that Linda, or any other defendant, coerced, assisted or encouraged the Milford to act in any way other than as a responsible fiduciaiy independent of her, or that she appropriated, for her own personal use and control, any asset over which the Milford acted as a fiduciaiy. Lastly, Ellis introduced no evidence that she sustained damages as a result of the Milford’s retention of her Varney Bros, stock, or that her position would have been any different had she obtained the shares of stock at any point in time prior to her actually obtaining the shares, free of trust. The plaintiff has not provided any evidence that the value of her shares of stock suffered any loss during the time that they were retained by the Milford nor any evidence that she has suffered any financial harm for the loss of the use of the shares during that time.
115. Ellis has not been denied the benefits of stock ownership. To the contrary, she has been paid substantial dividends, albeit less than she wanted to be paid, and she has been paid exactly the same per share dividends as other shareholders. Varney Bros, made distributions to or for the benefit of its shareholders in 1992 ($833.33 per share), January 1999 ($3,100 per share), October 1999 ($600 per share), May 2000 ($1,000 per share) and May 2002 ($325 per share). Distributions to or for the benefit of Ellis totaled $37,499.85 in 1992, $294,500 in January 1999, $57,000 in October 1999, $95,000 in May 2000, and $30,875 in May 2002. The per share distributions to or for the benefit of Ellis were identical to the per share distributions to the other shareholders.
116. The board of directors has established no dividend distribution policy, despite Ellis’s request in 2000 for the board to do so. There is no dividend policy in the minute book of the Corporation. (Ex. 71.) Linda admitted that the board’s failure from 1992 through 1997 to make distributions sufficient to cover taxes was wrong, and that the Corporation should have distributed sufficient money to the shareholders during those years at least sufficient to cover the shareholders’ tax obligations from owning stock in the Corporation. Linda admitted that the board did not *415 begin to make such distributions until after Ellis engaged Raphaelson & Mullady to represent her.
117. Linda testified that the Corporation annually needed to build cash reserves of about $500,000 or $600,000, in anticipation of customary cash flow reverses due to the colder, i.e., slower, business months. At year end 1999, the Corporation had cash or cash equivalents of over $1.1 million; and at year end 2000, 2001 and 2002, the Corporation had about $1.5 million in cash or cash equivalents, or apparently almost $1 million more than it needed for its operations. There was no evidence that prior to 1998, the corporation was in a position to allow for payment of dividends beyond those actually paid. Given the lack of any evidence that the extra cash on hand following the years of 1999, 2000, 2001 and 2002, was necessary to be retained as working capital, or the lack of any explanation as to the reason why this cash on hand was retained, other than that necessary to pay on the promissory note given to Linda Varney in 1998, I infer that the amount of $485,000.00 has been reserved for this purpose.[27]
118. There was no evidence that Elizabeth Varney has received money or things of value from Varney Bros., directly or indirectly, beyond what Ellis has received and no evidence that Jon Varney has received money or things of value from Varney Bros., directly or indirectly, beyond what Jane Ellis has received, except insofar as Jon has been paid salary for services he has rendered to Varney Bros. There was no evidence that the salary Jon has received for services rendered to the corporation exceeds the value of his services to the corporation. Jon, whose legal and equitable ownership of Varney Bros, stock is equal to Ellis’s, has been employed full-time by Varney Bros, since the year 2000. Prior to beginning work full-time for Varney Bros, in the year 2000, Jon obtained a college degree in civil engineering and obtained experience in the concrete business working for several years for a contractor on the “Big Dig” construction project in Boston. Before then, he had summer and school vacation jobs with Varney Bros.
119. There was no evidence that Ellis has, on any occasion, sought to sell her Varney Bros, stock to the corporation, to the existing shareholders, or to any defendant, nor that any defendant, on any occasion, sought to purchase Ellis’s Varney Bros, stock from her. The evidence does not show that any defendant engaged in any effort to coerce Ellis into selling her shares of Varney Bros, stock at less than fair value or at a price below that which would be paid to other shareholders. There was no evidence that Varney Bros, stock owned by any shareholder of the corporation other than Ellis has been purchased from such shareholder. There was no evidence that Varney Bros, has offered to repurchase stock from any shareholder other than Ellis or that any person has offered to purchase Varney Bros, stock from such shareholders. Ellis has never depended for her livelihood on employment with Varney Bros. Ellis inherited all of her stock in Varney Bros. She paid no money and gave nothing of value for her stock. (Ex. 133.)
120. In 1997, Ellis became involved in divorce proceedings with her then-husband, Richard Ellis. How the Ellis’ assets should be divided between them, and the parties’ respective financial obligations after the divorce, were contested issues in the divorce. The divorce action between the Ellises was ultimately settled. In connection with the divorce settlement she reached with Richard Ellis, Ellis agreed to prosecute this lawsuit.
121. Prior to the commencement of this lawsuit, Ellis was not excluded from management of Varney Bros. She played no part in Varney Bros.’s management because she had never expressed any wish to do so. Ellis did not, at any time relevant to this litigation, seek to be elected an officer or director of Varney Bros. Ellis never nominated or identified to any officer, director or stockholder of Varney Bros, any person she wished to be elected an officer or director of the corporation. When she commenced this litigation, and even two years after commencing it, Ellis was herself completely unaware of the qualify and/or quantity of services Linda had provided to the corporation, even though a key component of her claim is that Linda has allegedly been overcompensated for her services. She also had no understanding of the responsibilities of a director of Varney Bros, and had made no effort to gain an understanding on that subject. She had given no significant thought to what Varney Bros, should be doing with respect to sale or development of its real estate, did not know whether or not real estate transactions accomplished by Varney Bros, during Linda’s tenure as chief executive order were beneficial to the corporation, and had made no efforts to inform herself on that subject. When she commenced this litigation, and even two years after commencing it, Ellis had herself given no thought to what she would do as a Varney Bros, shareholder if Linda and the other directors were removed from their management positions and had given no thought to how Varney Bros, would be run if Linda and the other directors were removed as she requests in her complaint.
122. Ellis never personally sought information concerning Varney Bros.’s business from Linda or from any other officer, director or shareholder of Varney Bros., although beginning with Christine Burke, an attorney who represented Ellis from June 1992, with respect to her interests in the corporation, the CEV Trust, and the DAV Trust, Linda was asked for specific information concerning Varney Bros.’s business in 1993. Linda directed Burke to the sources where the requested information could be obtained, specifically, to Shelley D. Vincent, III and to Howard Medwed. Shelley D. Vincent, III was the clerk of Varney Bros, and had custody of its minute book. He was also the *416 officer at the Milford, trustee of the CEV Trust with responsibility for managing that trust. Howard Medwed was an attorney representing Varney Bros. Burke was provided with the information concerning Varney Bros, she requested.
123. Linda was appointed Trustee of the DAV Trust in October 1992. (Ex. 10.) At that time, the assets of the trust included 150 shares of stock in the Corporation and 640 shares of stock in the Milford National Bank. (Ex. 13.) Linda distributed the Varney Bros, stock in early 1998. She has not yet distributed the Milford stock to the beneficiaries. Linda testified that as of 2000, her fee was the only liability of the trust. As the trustee has the power under the trust to sell trust assets in order to pay expenses of the trust, Linda has offered no reasonable explanation for her failure to have done so, other than the fact that the Milford is itself a privately held, closed corporation. However, the evidence has not shown that Linda ever attempted to sell to any party other than the beneficiaries herein, any of these shares in order to pay her trustee fee nor that she had offered to transfer the shares free and dear of the trust upon payment by Ellis of her share of any fee owed. There is evidence that she offered to sell shares to Ellis for cash. She furnished the court with no basis to value the services she rendered as trustee for any period.
124. The by-laws of Varney Bros, provide that its directors shall be elected by the stockholders, with each stockholder having one vote for each share of stock owned by him or her. (Ex. 55, Art. I, §6, and Art. II, §2.) The powers and duties of the Board of Directors are to manage the business of Varney Bros.; fix compensation of the officers; fix duties of the officers; determine in their discretion what constitutes net earnings, profits, and surplus; determine in their discretion what amount shall be reserved for working capital and for any other purpose; and determine what amount shall be declared as dividends. The determinations on these matters by the directors shall be final and conclusive. (Ex. 55, Art. II, §1.)[28]
125. At the present time, there are four shareholders of Varney Bros.: Ellis, Jon, Elizabeth Varney, and the Milford as executor of the estate of Richard Varney. Ellis, Jon, and Elizabeth Varney each own 95 shares of Varney Bros, stock; the Milford owns 15 shares. (Ex. 59.) Elizabeth Varney and the Milford are not parties to this litigation and, consequently, their rights to vote for directors of their choosing cannot be adjudicated in this litigation.
126. With respect to all of the transactions and corporate business discussed above, none of the individual defendants acted in bad faith, knowingly breached a fiduciary duty to Varney Bros, or Ellis, or was motivated by a dishonest or improper purpose.
RULINGS OF LAW
I. Introduction
Ellis complains that, as a minority stockholder in a close corporation, she has suffered direct and indirect financial loss due to a lack of loyalty and diligence, in breach of their fiduciary duty to the corporation, on the part of the defendant officers and directors permitting self-dealing by Linda Varney, the president of the company and a director. Moreover, she contends that not only does a series of individual decisions by the officers and directors of Varney Bros., some of whom also bore concurrent responsibilities as fiduciaries to beneficial interests she had in two trusts, represent breaches of duty to the corporation and to her as a minority stockholder, but they also demonstrate an overarching attempt to freeze her out of her ownership interest. She attributes this to the control Linda Varney has over the board of directors and the majoriiy of stock interest that was held in trust, during relevant times, by the Milford Bank and Trust, trustee of the CEV Trust, chiefly by its trust officer, Shelley Vincent, III, a director of Varney Bros., and herself, as trustee of the DAV Trust. Ellis complains that Linda, by conspiring with the Milford and others to wrongfully withhold shares to which she was entitled from the testamentary trust of her grandfather Clarence Varney, has successfully converted her shares and excluded her from participation in the management of the company and prevented Ellis from learning of her self-dealing. Ellis also contends that Linda Varney, as trustee, continues to wrongfully withhold shares of the Milford Bank & Trust to which she was entitled to receive from the trust of her great-uncle Donald Varney. Her complaint with the Board of Directors of Varney Bros, is essentially that they have yielded excessive compensation to Linda to the detriment of the shareholders which, when combined with the fact that there is no declared policy regarding dividends, allows Linda to have a status elevated and preferred over shareholders, and provides Linda with bonus compensation which is rightfully earnings that should be distributed to shareholders in the form of dividends. When coupled with her complaint regarding Linda’s relationship with the Bank, Ellis contends that the bank has subordinated her rights to obtain the shares to which she was long entitled to the interests of Linda Varney to deny her access to the corporation.
To remedy this situation, she seeks compensatory and equitable relief pursuant to derivative claims, on behalf of Varney Bros., and individual claims in her own behalf, against the defendants. Specifically, in somewhat related claims and prayers for relief, Ellis seeks a judgment against Linda that orders her to disgorge excess compensation, ajudgment against the directors for breach of their duly of diligence in having permitted the excess compensation, and an order that the corporation declare a dividend policy in order to allow her, and the other shareholders, to obtain financial benefit from their ownership interest in the company. In addition, Ellis contends that her interests as a minority shareholder will continue to be subordinated to the majority unless an order is entered that *417 would remove the current officers and directors, and fill the positions with persons independent of Linda Varney, and order the directors to declare a policy for the payment of dividends. Finally, Ellis seeks damages for conversion of her shares.
II. Applicable Standards of Law
A. Close Corporation
A close corporation is ordinarily defined as one which has a small number of stockholders, no ready market for its stock, and substantial majority stockholder participation in the management, direction and operations of the corporation. Harrison v. NetCentric Corp., 433 Mass. 465, 469 n.6 (2001); Donahue v. Rodd Electrotype Co. of New England, 367 Mass. 578, 586 (1975).
Varney Bros, meets the first two of these criteria and, prior to March 1992, met all of them. Since March 1992, Varney Bros, has differed from the typical close corporation because the persons beneficially interested in its stock have, for the most part, played no role in its management, given the division between legal and beneficial interests represented by the two trusts. Between March 1992, and the year 2000, no one beneficially interested in a substantial portion of Varney Bros, stock was engaged in the corporation’s day-to-day management, though one such person, Jon Varney, has served on the Board of Directors. Since 2000, Jon is the only person beneficially interested in a substantial portion of Varney Bros, to have participated in day-to-day management activities. However, for all practical purposes, Varney Bros, is a close corporation. Since October 1992, Linda has been, in addition to president and director of the corporation, trustee of the DAV Trust, the holder of one-half of the issued shares until 1998, when the company shares were delivered to the beneficiaries of the trust.
In a close corporation, the controlling stockholders owe minority stockholders the same fiduciary duty of utmost good faith and loyalty that partners owe to one another. Demoulas v. Demoulas, 428 Mass. 555, 578 (1998); Donahue v. Rodd Electrotype Co. of New England, 367 Mass, at 587. Ellis is not heard to complain about her fellow “beneficial” shareholders, one of whom is not a party, and against neither of whom does she make any complaint of self-dealing, except to say that one, Jon Varney, is dependent upon and controlled by Linda, his mother. Indeed, during the times relevant to her complaint, the other present owners of shares were, other than in age, in precisely the same position as she: namely, residual beneficiaries of the CEV Trust and DAV Trust without any voting rights. Ellis complains that Linda, as president, director and trustee, controlled the majority of the directors and shareholders with voting rights and it is against these parties and their actions, viz-a-viz Linda, that the plaintiff takes issue.
B. General Standards of Corporate Governance
The directors of a corporation stand in a fiduciary relationship to the corporation and owe to the corporation both a duty of care and a paramount duty of loyally. Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 528-29 (1997). With respect to the duly of care, directors must act in complete good faith and must exercise reasonable intelligence in conducting the affairs of the corporation. Murphy v. Hanlon, 322 Mass. 683, 686 (1948); Sagalyn v. Meekins, Packard & Wheat Inc., 290 Mass. 434, 438 (1935). Directors are not responsible for mere errors of judgment or want of prudence, but can be liable for clear and gross negligence in their conduct. Allied Freightways v. Cholfin, 325 Mass. 630, 634 (1950); Spiegel v. Beacon Participations, Inc., 297 Mass. 398, 411 (1937).
With respect to the duty of loyalty, directors “are bound to act with absolute fidelity and must place their duties to the corporation above eveiy other financial or business obligation . . . They cannot be permitted to serve two masters whose interests are antagonistic.” Demoulas v. Demoulas Super Markets, Inc., 424 Mass, at 528, quoting Spiegel v. Beacon Participations, Inc., 297 Mass, at 410-11. The paramount duty of directors is to the corporation, and their personal pecuniary interests are subordinate to that duty. Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass, at 594. Directors and officers thus must refrain from promoting their own interests in a manner injurious to the corporation. Geller v. Allied-Lyons PLC, 42 Mass.App.Ct. 120, 122 (1997).
A board of directors exists to safeguard the interest of the company and its shareholders. A director’s “paramount duty” of loyalty to the company includes the duty to exercise diligence and independent judgment to protect the company’s interests. See Demoulas v. Demoulas Supermarkets, Inc., 424 Mass, at 522 (primary responsibility for protecting the interests of a corporation rests with its officers and directors); Allied Freightways, Inc. v. Cholfin., 325 Mass, at 634 (director must act with due diligence in supervising the conduct of corporate business); Stoneman v. Fox Film Corp., 295 Mass. 419, 425 (1936) (directors must exercise their own independent judgment for the highest welfare of the corporation). In particular, a director has a duty to ensure that the company’s interests are not sacrificed to the personal interests or pecuniary gain of any individual officer or director. Independent and diligent scrutiny by the directors is the company’s chief defense against self-seeking conduct by the company’s officers. Subservient behavior by a director, particularly when it is subservient to the self-dealing of another officer or director, is a fundamental violation of the director’s fiduciary obligations.
III. Defense of Unclean Hands
As a threshold matter, the defendants contend that Ellis is barred from recovering on any of her claims *418 under the equitable doctrine of unclean hands. The doctrine of “unclean hands” denies equitable relief to one tainted with inequitableness or bad faith directly affecting the matter in which she seeks relief. Amerada Hess Corp. v. Garabedian, 416 Mass. 149, 156 (1993); Fidelity Management & Research Co. v. Ostrander, 40 Mass.App.Ct. 195, 200 (1996). Even a party guilty of intentional violation of the law does not lose the right to relief where her cause of action arises independently of her unlawful conduct and relief by the court will not further any unlawful scheme or produce substantial injustice or public harm. Braga v. Braga 314 Mass. 666, 672 (1943); New York, N.H. & H.R.R Co. v. Pierce Coach Lines, Inc., 281 Mass. 479, 482 (1933). The question of whether to deny relief to a party under the doctrine of unclean hands is committed to the sound discretion of the trial judge. Fales v. Glass, 9 Mass.App.Ct. 570, 575 (1980).
The defendants contend that Ellis’s pursuit of this lawsuit is not motivated by a desire to protect the interests of Varney Bros, and its shareholders but rather, is motivated by the fact that she agreed to prosecute a lawsuit against the defendants as part of a divorce settlement with her former husband, Richard. In a close corporation, all stockholders owe each other the same fiduciary duty of utmost good faith and loyalty that partners owe to one another. Demoulas v. Demoulas, 428 Mass, at 578; Donahue v. Rodd Electrotype Co. of New England, 367 Mass, at 587. The defendants contend that by prosecuting this lawsuit as part of a divorce settlement made for her own financial benefit, Ellis breached her duty to her fellow shareholders to subordinate her personal interests to the best interests of the corporation, and therefore appears before this Court with unclean hands, precluding relief. Regardless of whether Ellis has mixed motives for pursuing this lawsuit, this Court, in its discretion, declines to bar her under the doctrine of unclean hands from seeking relief for the defendants’ alleged breaches of fiduciary duty. See, e.g., Flynn v. Haddad, 25 Mass.App.Ct. 496, 506, rev. den., 402 Mass. 1104 (1988) (one partner’s bad faith conduct in attempting to take title to partnership property in his own name did not bar him from recovering debt owed to him by partnership). Cf. Hawthorne’s, Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 208 (1993) (court properly denied lessee equitable relief of specific performance under an option to purchase in commercial lease where lessee engaged in deceptive and unfair conduct to cause failure of sale of property to competitor).
IV. Ellis’s Derivative Claims
A. Claim for Compensatory Damages Due to Excess Compensation and Waste of Corporate Assets
Ellis complains of numerous acts of self-dealing by Linda Varney and condoned by the officers and directors directly detrimental to the corporation and indirectly to her interest as a shareholder. First, Ellis complains that Linda received a $150,000 “salary” payment in 1987 in excess of the value of her services, and that Linda has received excessive salary and benefits as a result of the Employment Agreement commencing in 1993.
It is not the proper role of the court to substitute its judgment for the reasonable judgments of disinterested corporate directors. Even in close corporations, the directors must be accorded a large measure of discretion in such matters as deciding who the corporate officers will be and what their compensation and terms of employment will be. Wilkes v. Spring side Nursing Home, Inc., 370 Mass. 842, 851-52 (1976). However, where personal advantage is involved, as in the fixing of salaries to be received by directors, there is a fiduciary element at issue which may be open to inquiry in a court of equity. Sagalyn v. Meekins, Packard & Wheat, Inc., 290 Mass, at 438-39; Crowley v. Communications for Hospitals, Inc., 30 Mass.App.Ct. 751, 758, rev. den., 410 Mass. 1104 (1991). When the directors are also the officers,- as is the usual case in close corporations, and compensation is paid by the directors to themselves or members of their families as officers or employees, such self-interested transactions are subject to “vigorous scrutiny,” placing upon the directors the burden of proving both the good faith of the transaction and its inherent fairness from the viewpoint of the corporation and those interested therein. Crowley v. Communications for Hospitals, Inc., 30 Mass.App.Ct. at 757.
The reasonableness of compensation for the performance of executive duties by an officer of a corporation is a question of fact. Black v. Parker Manuf. Co., 329 Mass. 105, 116 (1952); Crowley v. Communications for Hospitals, Inc., 30 Mass.App.Ct. at 758. A salary must bear a reasonable relation to the officer’s ability and to the quantity and quality of the services rendered. Black v. Parker Manuf. Co., 329 Mass, at 116. Relevant factors include the responsibilities assumed, the difficulties involved and the success achieved. Id.
Ellis contends that the directors at the time, including Jerrier, breached their fiduciary duty to the corporation by authorizing the $150,000 payment to Linda, and that Linda as president breached her fiduciary duty to the corporation in accepting said payment. As directors, Jerrier were required to act in complete good faith in the interests of Varney Bros, and to exercise reasonable intelligence in authorizing the payment. See Murphy v. Hanlon, 322 Mass, at 686; Sagalyn v. Meekins, Packard & Wheat, Inc., 290 Mass, at 438. Ellis has not met her burden of demonstrating that the directors acted in bad faith in voting to compensate Linda for her past services. See Murphy v. Hanlon, 322 Mass, at 687 (plaintiff has burden to show bad faith or breach of duty by corporate officers or directors). Bad faith is not simply bad judgment or negligence; rather, it imports a dishonest purpose or *419 conscious doing of wrong, a breach of a known duly through a motive of interest or ill will, or fraud. Spiegel v. Beacon Participations, Inc., 297 Mass, at 416. Moreover, as found by this Court supra, the decision to pay Linda $150,000 for services provided between 1972 and 1987 was reasonable and not excessive. Accordingly, the directors did not breach their fiduciary duty to Varney Bros, in authorizing the 1987 payment. Given that Linda was not a director at the time and did not participate in the decision to authorize the payment, it was not a self-dealing transaction on her part which must be subj ected to rigorous scrutiny. In any event, given the reasonableness of the $150,000 payment, Linda’s acceptance of that amount did not breach her fiduciary duty to refrain from placing her personal pecuniary interests above the interests of the corporation. See Uccello v. Gold'n Foods, 325 Mass. 319, 327 (1950) (directors, officers and shareholders not barred from receiving reasonable compensation for their services).
With respect to the 1993 Employment Agreement, Ellis contends that Linda breached her fiduciary duty to the corporation by failing to disclose to the Board the 1991 Draft Agreement and the full details and status of her divorce negotiations with Richard. Ellis further contends that Linda misled the Board into believing that Richard had agreed to the 25% net profit bonus compensation provision. A corporate officer or director may not procure personal profit in the conduct of corporate affairs without first making full and fair disclosure to the corporation. Demoulas v. Demoulas Super Markets, Inc. 424 Mass, at 531; Geller v. Allied-Lyons PLC, 42 Mass.App.Ct. at 126. Halfhearted or partial disclosure does not satisfy the fiduciary duty to make full disclosure; rather, the corporation must be apprized of all the material facts and their legal effect, to permit a disinterested decision maker to exercise its informed judgment. Dynan v. Fritz, 400 Mass. 230, 243 (1987); Geller v. Allied-Lyons PLC, 42 Mass.App.Ct. at 126. Where personal advantage is involved, an officer or director who fails to make the necessary full disclosure is liable for a breach of her fiduciary duly, even though she acted without corruption, dishonesty, or bad faith. Production Machine Co. v. Howe, 327 Mass. 372, 378 (1951); Sagalyn v. Meekins, Packard & Wheat, Inc., 290 Mass, at 439; Cain v. Cain, 3 Mass.App.Ct. 467, 476 (1975).
As this Court has found, supra when entering into the Employment Agreement with Linda, the Board was aware that Linda and Richard were negotiating in the context of their divorce but had not reached any final agreement concerning Linda’s employment with Varney Bros. An undisclosed fact is material if a reasonable man would attach importance to it in determining his course of action in the transaction in question. Zimmerman v. Kent, 31 Mass.App.Ct. 72, 78 (1991). The terms of the 1991 Draft Agreement were not material to the Board’s decision to grant a contract to Linda in 1993, given the drastically changed circumstances. Accordingly, Linda’s failure to disclose the Draft Agreement to the Board was not a breach of her fiduciary duly to make full and fair disclosure to the corporation in a self-interested transaction.
Ellis further contends that the directors, including the defendants Linda, Jon and Jerrier, breached their fiduciary duty as directors in voting to approve the 1993 Employment Agreement by acting in bad faith to benefit Linda at the corporation’s expense, failing to subject Linda’s proposed terms to meaningful independent scrutiny and negotiation, and authorizing excessive compensation. Foremost, Ellis has not met her burden of demonstrating that the directors acted in bad faith in voting to approve the 1993 Employment Agreement. See Murphy v. Hanlon, 322 Mass, at 687 (plaintiff has burden to show bad faith or breach of duty by corporate officers or directors). Bad faith is not simply bad judgment or negligence; rather, it imports a dishonest purpose or conscious doing of wrong, a breach of a known duty through a motive of interest or ill will, or fraud. Spiegel v. Beacon Participations, Inc., 297 Mass, at 416. The record does not support the claim that Jon or Jerrier acted with an improper motive or in knowing breach of duty in approving Linda’s contract.
However, Ellis further argues that Jon and Jerrier breached their fiduciary duty to the corporation by failing to subject Linda’s proposed terms of employment to diligent, independent scrutiny to protect Varney Bros.’s interests. “An insider contract starts out as suspect because of a question or doubt whether the interests of the corporation have had any true representation, whether the contract resulted from anything on the order of an arm’s-length negotiation.” Cooke v. Lynn Sand & Stone Co., 37 Mass.App.Ct. 490, 497 (1994). A director’s paramount duty of loyalty to the company includes the duty to exercise diligence and independent judgment to protect the company’s interests. See Demoulas v. Demoulas Supermarkets, Inc., 424 Mass, at 522; Stoneman v. Fox Film Corp., 295 Mass, at 425. Here, it does not appear that the 1993 Employment Agreement was the product of extensive proposals and counterproposals between Linda, through her counsel, and the remainder of the Board. Rather, Jon, Jerrier and Vincent appear to have largely acquiesced to Linda’s proposed terms, at least as far as the bonus provision is concerned. Regardless of whether those terms ultimately were fair to the corporation, the directors’ failure to diligently protect Varney Bros.’s interests by subjecting Linda’s proposal to more rigorous independent judgment breached their fiduciary duty of loyalty.
Finally, Ellis contends that Linda, Jon and Jerrier breached their fiduciary duties concerning the 1993 Employment Agreement because its terms are unfair to the corporation and constitute excessive compensation of Linda as President. When a self-interested *420 transaction is challenged, the burden is on the officer or director to demonstrate both the good faith of the transaction and its inherent fairness to the corporation. Demoulas v. Demoulas Super Markets, Inc., 424 Mass, at 529-30; Crowley v. Communications for Hospitals, Inc., 30 Mass.App.Ct. at 757. As discussed supra, there is no evidence that the directors acted in bad faith in approving the agreement. However, the question remains whether the terms of the agreement are fair to Varney Bros.[29]
This Court concludes that under the circumstances, including but not limited to the desire to keep Varney Bros, a family-operated business, the need for stability and continuity following Richard’s death in order to implement a long-term plan to improve the company’s financial position and groom Richard’s chosen successor, Jon, and Linda’s dedication, history of successful service, and experience with the company, the ten-year term of the agreement is not unreasonably long. Cf. Cooke v. Lynn Sand & Stone Co., 37 Mass.App.Ct. at 496-97 (invalidating five-year employment contract for president of close corporation who was also director and stockholder, where after directors declined his request for such a contract, the president persuaded the vice-president to sign the contract without disclosing it to the directors, in exchange for the president’s signing an employment contract for the vice-president). Further, the defendants have met their burden of demonstrating the fairness of the salary and benefit provisions of the Employment Agreement, given Linda’s extensive experience with and knowledge of the company, her achievement of goals set by the Board, her success in improving the company’s overall performance, and the market norms for contracts for executive officers in comparable corporations.
Nonetheless, the defendants have not met their burden of demonstrating that the 25% “net profit” incentive bonus is fair to the corporation, given that it includes profit from the sale of real estate and other assets without reference to whether such sales are achieved at prices higher than appraised value. This bonus not only fails to operate as a genuine incentive to increase net income from operations, it fails to create an incentive to increase net income from asset sale transactions. Linda’s receipt of bonuses under this provision have been the result of real estate transactions reflecting the appreciation of real estate for which she can claim no credit and in which she expended little effort. As such, the 25% “net profit” bonus provision, if defined to include profit from the sale of corporate assets, is found to be detrimental to Varney Bros, and its shareholders. The directors’ authorization of this provision and Linda’s acceptance of bonuses thereunder constitute a breach of fiduciary duty. Given this court’s conclusion that the bonus provision, as defined, is unreasonable and unfair to the corporation, Linda must disgorge any of the $751,668 in bonuses actually paid to her between 1993 and 2001, to the extent that such bonuses paid were inclusive of proceeds from the sale of company assets. See Demoulas v. Demoulas Super Markets, Inc., 424 Mass, at 556. However, the evidence did not reveal that any amounts prior to the bonus accrued in 1998 were generated by the sale of company assets. To the extent that her bonuses were awarded in the form of promissory notes by the corporation, recission of those notes is appropriate. Moreover, with this obligation to pay Linda Varney being nullified hereby, and given the unexplained amount of extra cash on hand retained by the corporation since the accrual of her 1998 bonus, having inferred that a portion of the retained earnings is held in reserve as against this bonus obligation, it is thus reasonable to infer that, of the amount of cash retained in excess of apparent company requirements, the amount of $485,000.00, can be, and is deemed surplus funds and available as dividends to the three shareholders on apro ratabasis.
Ellis urges that Linda be required to forfeit her entire compensation as a remedy for this breach. While a fiduciary may be required to forfeit the right to retain or receive her compensation for conduct in violation of her fiduciary duties, she will generally be required to repay only that portion of her compensation, if any, that was in excess of the worth of her services. Meehan v. Shaughnessy, 404 Mass. 419, 440 (1989); Chelsea Indus., Inc. v. Gaffney, 389 Mass. 1, 12(1983). “This limitation stems from the premise that the forfeiture remedy is not a penalty but really reimbursement of payment for services not properly performed . . . Therefore, compensation is often apportioned in relation to the services indeed properly performed.” In re Tri-Star Technologies Co. Inc., 257 B.R. 629, 636 (D.Mass. 2001). See Anderson Corp. v. Blanch, 340 Mass. 43, 51 (1959); Lydia E. Pinkham Medicine Co. v. Gove, 303 Mass. 1, 4 (1939). The fiduciary bears the burden of proving the fair value of her services during the time she engaged in disloyal conduct, and if she fails to do so, it is appropriate to forfeit the entire amount of the compensation. Chelsea Industries, Inc. v. Gaffney, 389 Mass, at 14; Anderson Corp. v. Blanch, 340 Mass, at 51. The extent of equitable forfeiture of compensation is left to the sound discretion of the court with reference to the peculiar factors found to be present, including how egregious the breach of fiduciary duty was, whether the breach caused actual injury to the corporation, and the extent to which the improper activities diverted the fiduciary’s time and energy from her corporate responsibilities. See Anderson Corp. v. Blanch, 340 Mass, at 50-51; Production Machine Co. v. Howe, 327 Mass, at 378-79.
Here, Linda’s breach of fiduciary duly in voting for as a director and accepting as president the unfair bonus provision did cause some financial harm to the corporation but did not divert Linda’s time and energy from her corporate responsibilities as CEO. This Court, in its discretion, concludes that the breach was *421 not so egregious as to warrant the forfeiture of Linda’s entire compensation. Cf. BFP v. Germanium Power Devices Corp., 13 Mass.App.Ct. 166, 177, rev. den., 385 Mass. 1105 (1982) (not an abuse of discretion to require disloyal corporate officers to repay to corporation their entire salaries during period of disloyalty, where officers misused confidential corporate information to usurp a corporate opportunity). Insofar as Linda has demonstrated that her salary and other benefits were commensurate with the fair value of her services to Varney Bros., disgorgement of any bonuses received is the proper remedy. See Sagalyn v. Meekins, Packard & Wheat, Inc., 290 Mass, at 439 (where directors voted themselves excessive salaries as officers, thereby breaching their fiduciary duties for personal profit, they must refund to the corporation the excess above the fair value of their services).[30]
In addition to her complaints concerning Linda’s compensation, Ellis seeks a judgment against each of the directors in connection with the Hopedale land transaction, contending that the directors breached their fiduciary duty by paying $450,200 in excess of the value of the land and that Linda breached her fiduciary duty by receiving $150,000 in August of 1993 from the sale. Despite the low assessed value of the parcel, in light of the tax benefit to Varney Bros, from the transaction, Linda has met her burden of demonstrating both the good faith of the Hopedale land transaction and its inherent fairness to the corporation. See Demoulas v. Demoulas Super Markets, Inc., 424 Mass, at 529-30; Crowley v. Communications for Hospitals, Inc., 30 Mass.App.Ct. at 757. Further, Ellis has failed to establish that the individual directors breached their duties of good faith and reasonable intelligence with respect to the Hopedale land transaction.
Ellis further complains that Linda’s delivery of the two $10,000 checks to her daughters was an improper use of corporate funds. The diversion of corporate funds for personal use is a breach of an officer and director’s fiduciary duty of loyalty to the corporation. Allied Freightways, Inc. v. Cholfin, 325 Mass, at 632-33. However, as found supra, the checks at issue were not paid with Varney Bros, funds and therefore, delivery of those checks after Richard’s death, even if improper vis a vis his estate, does not constitute a waste of corporate assets for which Linda may be liable in this action.
Finally, Ellis contends that Linda has taken advantage of an improper accounting of funds in drawing accounts showing an additional $100,000.00 to which she is not entitled, and seeks damages from Linda and Jerrier to repay these funds to the corporation. Ellis has not demonstrated that the failure to reverse the $100,000 entry in Linda’s drawing account was an intentional diversion of corporate assets and thus, a breach of fiduciary duty. Cf. Allied Freightways, Inc. v. Cholfln, 325 Mass, at 632-33 (diversion of corporate funds for personal use is breach of director’s fiduciary duty). Rather, the failure appears to be in the nature of an accounting oversight constituting a mere error of judgment or want of prudence, for which corporate officers and directors are immune from individual liability. See Id. at 634; Spiegel v. Beacon Participations, Inc., 297 Mass, at 411. Nonetheless, Ellis is entitled to an order that the corporation reduce Linda’s drawing account by $100,000. To the extent that her drawing account contains less than said amount, Linda must repay to the corporation the amount by which her drawing account is less than $100,000.00.[31]
B. Claim of Freeze-out
Ellis contends that the actions of the directors and officers, most notably those of Linda Varney, should not be viewed in isolation as individual breaches of the fiduciary duty owed to the corporation and to her as a minority stockholder, but rather as evidence of a plan or scheme to freeze her out of her rightful ownership interest in Varney Bros., the protection of which, she contends, requires extraordinary relief.
In close corporations, corporate directors must be accorded a large measure of discretion in such matters as declaring or withholding dividends, deciding whether to merge or consolidate, establishing the salaries of corporate officers, dismissing directors with or without cause, and hiring and firing corporate employees. Wilkes v. Springside Nursing Home, Inc., 370 Mass, at 851. However, the majority’s discretion to make corporate decisions is restrained by the fiduciary duty of utmost good faith and loyalty owed by all stockholders in a close corporation to one another, and the majority cannot employ oppressive devices to “freeze out” the minority interest. Donahue v. Rodd Electrotype Co. of New England, 367 Mass, at 588-89. A typical freeze-out may include the following actions:
the squeezers (those who employ the freeze-out techniques) may refuse to declare dividends; they may drain off the corporation’s earnings in the form of exorbitant salaries and bonuses to the majority shareholder-officers and perhaps to their relatives, or in the form of high rent by the corporation for property leased from majority shareholders . . .; they may deprive minority shareholders of corporate offices and of employment by the company; they may cause the corporation to sell its assets at an inadequate price to the majority shareholders ... In particular, the power of the board of directors, controlled by the majority, to declare or withhold dividends and to deny the minority employment is easily converted to a device to disadvantage minority stockholders.
Id. See also Bodio v. Ellis, 401 Mass. 1, 9-10 (1987) (shareholder /director’s acquisition of additional stock in order to force another shareholder/director to retire was a freeze-out which breached fiduciary duty and *422 warranted equitable relief where the two shareholders at all times had expectation of equal control); Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass, at 598-600 (improper “freeze out” occurred where majority deprived the minority of equal opportunity to have its stock repurchased by the corporation) . A common “freeze out” scenario occurs when the majority denies a minority stockholder employment as an officer, director or employee of the corporation, thereby effectively frustrating the minority stockholder’s purposes in entering into the corporate venture, restricting his participation in the management of the business, and denying him an equal return on his investment in the form of an anticipated salary, bonuses and similar benefits. Merola v. Exergen Corp., 423 Mass. 461, 464 (1996); Wilkes v. Springside Nursing Home, Inc., 370 Mass, at 849-50.
Although Ellis may be able to demonstrate that she has not obtained the benefits of stock ownership that she desired and perhaps expected, and while she may be entitled to relief for certain discrete breaches of fiduciary duty, this Court does not agree that her case presents a freeze-out, typical or otherwise, of a minority stockholder, warranting relief of an extraordinary nature. It is not sufficient for a party challenging a transaction to merely label it a “freeze out.” Leader v. Hycor, Inc., 395 Mass. 215, 221 (1985). Freeze-outs, by definition, are coercive and manifestly inequitable. Id. A minority shareholder must demonstrate either that the majority’s actions lacked a legitimate business purpose or that the same legitimate objective could have been achieved through an alternative course of action less harmful to the minority’s interests. Wilkes v. Springside Nursing Home, Inc., 370 Mass, at 851-52.
While not intending to minimize her inheritance, and the rights attendant upon stock ownership, Ellis neither contributed capital as an investor which she cannot recover, nor did she have an expectation of a livelihood from corporate salary and related benefits which was thwarted. Cf. Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass, at 591 (in typical freeze-out, minority stockholder in a close corporation, who has a substantial percentage of his personal assets invested therein, is “cut off from all corporation-related revenues” and “must either suffer their losses or seek a buyer for their shares,” an unlikely proposition).
Further, although Ellis has demonstrated that Linda received excessive compensation in the form of unfair bonuses, Ellis has not proven that such payments were made in bad faith as part of an attempt to freeze out her interest in Varney Bros, or deny her income to which she was otherwise entitled. Cf. Crowley v. Communications for Hosp., Inc., 30 Mass.App.Ct. at 762 (majority froze out minority stockholder by paying themselves excessive compensation, refusing to declare dividends, failing to redeem minority shares on same basis as was available to the majority, and attempting to purchase minority shares at bargain price).
Nor has Ellis established that any failure to declare dividends was either a breach of the directors’ fiduciary duty or part of a “freeze out” of her interest. At the time of the agreement in May 1993, the Milford Bank & Trust, as trustee of the CEV Trust, was well within its rights to retain and vote Ellis’s shares, as was Linda, as trustee of the DAV Trust, given the lifetime beneficial interest of Harriet Varney, Donald’s widow, who was still living. When the two trusts were established, both Clarence and Donald Varney were alive, as was Clarence’s son Richard. It is reasonable to infer that the settlors of these trusts, given the family business which they created, the shares of stock in the company that made up the bulk of the trust corpus in both trusts, and the trustees that they named (Richard, in the case of the DAV Trust, and Shelley Vincent, Jr., for the CEV Trust, both of whom were officers and directors in the company), expected that the trustees would be acting under dual loyalties, namely, for the company and for the beneficiaries, much like those in Shear v. Gabovitch, 43 Mass.App.Ct. 650 (1997). There, the court staled that “(r)elevant authority is to be found in cases where the settlor, head of a family business, puts the shares in trust for the benefit of his family. In such cases, the trustee is frequently the chief executive officer of the business or at least one of the directors. Family members’ complaints about the business’s dividend policy, or the allocation of jobs to family members, generally yield in decisions to the primacy of the business’s commercial needs.” Id. at 675. Here, Ellis has been paid the same per share dividends as other shareholders. The evidence shows that the corporation’s failure to declare dividends in certain years was based upon legitimate business considerations and not a bad faith attempt to deprive her of the benefits of stock ownership.
Thus, while Ellis may have established one or more breaches of fiduciary duty by defendants Linda, Jon, Jerrier and Molloy, she has not demonstrated that the allegedly improper conduct was coercive and manifestly inequitable so as to deprive her of her interest in the corporation. See Leader v. Hycor, Inc., 395 Mass, at 221. Cf. Crowley v. Communications for Hosp., Inc., 30 Mass.App.Ct. at 762 (majority froze out minority stockholder by paying themselves excessive compensation, refusing to declare dividends, failing to redeem minority shares on same basis as was available to the majority, and attempting to purchase minority shares at bargain price).
1. Claim for equitable relief in nature of an order for declaration of dividend policy
Ellis seeks an order that the Board of Directors establish an equitable dividend policy for Varney Bros, and determine how much of the company’s present *423 cash reserves should be distributed to the shareholders. Under Massachusetts law, directors in a close corporation are entitled to a large measure of discretion in declaring or withholding dividends. Merola v. Exergen Corp., 423 Mass, at 464; Wilkes v. Springside Nursing Home, Inc., 370 Mass, at 851. Varney Bros.’s bylaws commit to the directors’ sole discretion the determination of how much, if anything, to distribute in dividends. Ex. 55, Art. II, §1. The courts generally do not interfere with the sound fiscal management of the corporation by its directors, and the general rule is that the declaration of dividends rests within the discretion of the directors. Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass, at 589. The courts will interfere only where the failure to declare dividends is either a plain abuse of discretion or part of a plan to freeze out a minority shareholder. Id. at 589-90, 592.
“Excess cash funds not required for the security of the enterprise or to conduct its business may be appropriate for distribution as a dividend.” Crowley v. Communications for Hospitals, Inc. 30 Mass.App.Ct. at 767-68. Ordinarily, it is reasonable for directors to choose to declare no dividend at all in years when the corporation has not earned a profit. See Spiegel v. Beacon Participations, Inc., 297 Mass, at 427. Moreover, accumulated profits or surplus gives stockholders no right of income in the form of dividends until the directors in their discretion vote to declare a dividend. Joslin v. Boston & Maine RR, 274 Mass. 551, 555 (1931). The only restriction is that the directors’ discretion must be exercised in good faith and with reasonable intelligence. Id. In recent years, it has been Varney Bros.’s policy to pay dividends to shareholders even in unprofitable years if shareholders are subjected to tax liability because of the corporation’s operations. There is no evidence that Varney Bros, has not declared dividends whenever the company has been profitable. Ellis complains, however, that had Linda Varney not received excess compensation, more earnings would have been available for consideration as dividends. While that may be true in one year, namely, 1998, the plaintiff has not substantiated her claim that such would have been the case in any other year prior thereto.
The evidence at trial does reveal, however, a situation beginning in 1999 and continuing in subsequent years of retaining earnings in apparent excess of the minimum cash requirements necessary for the conduct and/or security of Varney Bros.’s business. However, given Ellis’ failure to demonstrate bad faith or an improper motive in the directors’ decision not to declare dividends, she is not entitled to the extraordinary relief of judicial interference, except when necessary to compel adherence with corporate by-laws. See Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass, at 589-90, 592. However, given the apparent extra cash on hand, and the lack of evidence that the board had established any need for the retention of such amounts of cash as working capital, or whether it had determined that some or all of the cash was surplus, the plaintiff is entitled, therefore, in addition to that relief ordered, supra, at pages 79-80, to an order that requires the board of directors annually, in compliance with the corporate bylaws, “to determine in their discretion what constitutes net earnings, profits, and surplus; determine in their discretion what amount shall be reserved for working capital and for any other purpose; and determine what amount shall be declared as dividends.” (Ex. 55, Art. II, §1.)
2. Claim for equitable relief in the nature of an order to reconstitute the Board of Directors
Ellis further seeks the removal of Linda Varney as a director and CEO of Varney Bros., the removal of Jon, Jerrier and Molloy as directors, and an order requiring the shareholders to select four directors who meet the standards for independence published by the New York Stock Exchange. There áre presently four shareholders of Varney Bros.: Ellis, Jon and Elizabeth Varney, who each own 95 shares of stock, and the Milford as executor of the estate of Richard Varney, which owns 15 shares. Essentially, Ellis seeks to deny the owners of a majority of Varney Bros, stock, including one person who was not sued (Elizabeth), another who is not charged with any wrongdoing in his own right as a stockholder (Jon) and a third party against whom no further action lies (the Milford), their right to select the directors they deem best suited to run the corporation. In general, our courts “have been disinclined to: interfere in those facets of internal corporate operations, such as the selection and retention or dismissal of officers, directors and employees, which essentially involve management decisions subject to the principle of majority control.” Wilkes v. Springside Nursing Home, Inc., 370 Mass, at 849. Nonetheless, under its general equitable jurisdiction, a court has broad powers to fashion an appropriate remedy for breaches of fiduciary duty in closely-held corporations. Demoulas v. Demoulas, 428 Mass, at 591. Thus, the court can remove a corporate director for breach of fiduciary duty when necessary to protect the interests of a close corporation and its minority shareholders. Demoulas v. Demoulas, 1996 WL 511519 (Mass.Sup.Ct 1996) (Lopez,. J.).
In the present case, although Ellis has proven one or more breaches of fiduciary duty, she has not demonstrated that the current directors of Varney Bros, are not managing it in accordance with the wishes of a majority of its shareholders and generally for the best interests of the corporation. Moreover, Ellis has not proved that the current directors have disregarded her interests as a shareholder or will do so in the future, nor has she proved that her Varney Bros, stock will be of no value to her if the current directors remain in office. To the contrary, the evidence is that Ellis has been paid substantial dividends declared by *424 the current directors. Under the circumstances of this case, the breaches of fiduciary duty shown by Ellis are not so egregious as to warrant judicial interference in the composition of the Board of Directors. Cf. Demoulas v. Demoulas, 1996 WL 511519 (Mass.Sup.Ct. 1996) (Lopez, J.) (removing two directors because “the best interests of a closely held family corporation cannot be advanced by a director who defrauds its shareholders”). Ellis therefore is not entitled to an order removing any current director or prohibiting any current director from serving in that capacity in the future.
V. Direct claims against Linda Varney
A. Conspiracy and conversion of 45 shares of Varney Bros, stock free of trust
Ellis contends that Linda conspired with the Milford Bank & Trust, as trustee of the CEV Trust, to deny her 45 shares of stock in Varney Bros, free of trust, in effect, amounting to a conversion of her shares from January 1993 to August 2002. Ellis seeks damages for the loss of the use of the stock during this period. A cause of action in the nature of conversion, for depriving a plaintiff of corporate stock, has long been recognized in Massachusetts. See Hall v. Paine, 224 Mass. 62, 66-67 (1916). Conversion is an intentional and wrongful exercise of ownership, control or dominion over personal property to which one has no right of possession, in a manner inconsistent with the rights of one who has a present entitlement to possession. Abington National Bank v. Ashwood Homes, Inc., 19 Mass.App. 503, 507 (1985). Wrongfully exercising control over personal property so that it is detained from a person who is entitled to possession is a conversion. Intentional interference with a plaintiffs receipt of an inheritance, if done through wrongful means is, likewise, an actionable tort. Monach v. Kozlowski, 322 Mass. 466, 470 (1948); Lewis v. Corbin, 195 Mass. 520, 525 (1907). Prevailing upon a trustee to withhold a distribution of trust assets for reasons that are not legitimately related to the trust is an actionable wrong. When two or more defendants commit a conversion, they are jointly and severally liable. Refrigeration Discount Corp. v. Catino, 330 Mass. 230, 235 (1953).
Further, under Massachusetts law, there is a cause of action for civil conspiracy where two or more parties act in concert with each other or pursuant to a common design to commit a tortious act, or give substantial assistance and encouragement to each other’s tortious conduct. Kyte v. Phillip Morris, Inc., 408 Mass. 162, 166-67 (1990); Kurker v. Hill, 44 Mass.App. 184, 188-89 (1998). See also Restatement (Second) of Torts, §876 (1979). Thus, one who knowingly participates in a breach of fiduciary duty is liable for the damage caused by the breach. Banks v. Everett Nat’l Bank, 305 Mass. 178, 182 (1940). Liability may extend to those who merely assisted in or encouraged the tortious act and does not necessarily require proof of an explicit agreement between defendants. Kyte v. Phillip Morris, Inc., 408 Mass, at 167-68; Massachusetts Laborers Health & Welfare Fund v. Phillip Morris, Inc., 62 F.Sup.2d 236, 244 (D.Mass. 1999). A tacit understanding is sufficient, and it may be inferred from the conduct of the parties, as proof of conspiracy commonly rests on circumstantial evidence. “The inferences from the evidence need not be inescapable; they need only be reasonable.” Commonwealth v. Camerano, 42 Mass.App. 363, 366 (1997).
The tortious conduct of the defendant, of itself, does not have to cause or even be a substantial factor in causing the plaintiffs injury. Payton v. Abbot Labs, 512 F.Sup. 1031, 1035 (D.Mass. 1981). Liability attaches whether the conspirator’s role was large or comparatively small, and whether the conspirator is involved from the beginning or lends aid well after the conspiracy is under way. Potter Press v. C.W. Potter, Inc., 303 Mass. 485, 492 (1939). “Each conspirator is liable for the acts of the others in pursuance of the conspiracy by which the wrong was finally accomplished.” General Mortgage & Loan Corp. v. Guaranty Mortgage & Securities Corp., 264 Mass. 253, 260 (1928).
Ellis contends that Linda Varney prevailed upon on the Milford’s representatives, primarily Shelley Vincent, III, but also the trust officers who succeeded him in supervision of this trust, to delay delivery of Ellis’s stock, which served Linda’s ulterior motive of excluding Ellis from participating as a shareholder in the corporation, and, by so doing, Linda effectively exercised control or dominion over the stock. Foremost, Ellis has not demonstrated that the decision of the Milford and its trust officers to retain her shares was anything other than for legitimate reasons related to the expenses of the trust. See In re Rothwell’s Estate, 283 Mass. 563, 570-71 (1933) (trustee properly refused to convey beneficial interest in trust until certain debts of the trust were paid). Thus, she has not established a wrongful exercise of ownership, control or dominion over her stock, as required to prove conversion. See Abington National Bank v. Ashwood Homes, Inc., 19 Mass.App. at 507. Even assuming that the Milford may have breached its fiduciary duty to Ellis in detaining the shares at issue, Ellis has not sustained her burden of proving that Linda knowingly participated in such a breach, acted in concert with the Milford in committing the breach, or gave the Milford substantial assistance and encouragement, thereby subjecting her to liability for conspiracy. See Kyte v. Phillip Morris, Inc., 408 Mass, at 166-67; Kurker v. Hill, 44 Mass.App.Ct. at 188-89.[32] Ellis simply has not demonstrated that Linda exercised any control over or otherwise interfered with the independent decision-making of the Milford. Linda knew that the Milford had a fiduciary duty to protect Ellis’s interests and that it could not legitimately subordinate those interests to her own, and she relied upon the independence of the bank trust officers to comply with their duty. The trust officers of the Milford, even if *425 suspicious of a discordance between Linda and Ellis, neither abdicated their independence nor subordinated their own responsibilities to any wishes and desires, of Linda concerning Ellis’s stock. Accordingly, Ellis cannot prevail on her conversion and conspiracy claims.
B. Claim for the Conversion or Unlawful Retention of Milford National Bank and Trust Company Stock Held in the DAV Trust
Ellis further contends that Linda wrongfully deprived her of the fair value of 213 shares of stock in the Milford National Bank and Trust Co. held in the DAV Trust for her benefit. Ellis seeks an order that Linda, in her capacity as trustee of the DAV Trust, immediately distribute these shares to her. As trustee of the DAV Trust, Linda owed a fiduciary duty to Ellis to act in good faith in administering the trust, to act in the best interests of the beneficiaries, and to refrain from deriving any personal advantage at the expense of the beneficiaries. Barnum v. Fay, 320 Mass. 177, 181 (1945); Comstock v. Bowles, 295 Mass. 250, 258 (1936); Shear v. Gabovitch, 43 Mass.App.Ct. at 682. A trustee also has a duty to exercise reasonable care and skill in the administration of the trust. Guerriero v. Commissioner of the Division of Medical Assistance, 433 Mass. 628, 633 (2001). Linda, as trustee, could properly refuse to convey the beneficial interest in the trust until the trust debts were paid. See In re Rothwell's Estate, 283 Mass, at 570-71.
In addition, the onset of this litigation asserting a claim against Linda as trustee of the DAV Trust potentially increased the expenses chargeable against the trust assets. See Boston Safe Deposit & Trust Co. v. Boone, 21 Mass.App.Ct. 637, 641 (1986) (trustee did not breach trust in failing to distribute stock held in trust where distribution had to be postponed pending litigation concerning validity of life tenant’s exercise of power of appointment). Nonetheless, the evidence did not show any reasonable effort by Linda prior to the instigation of this suit to sell the trust assets to pay the outstanding debts or to transfer the Milford shares free and clear of the trust upon payment by Ellis of her share of outstanding trust expenses. Nor has Linda established with reasonable specificity the value of the services she rendered as trustee, or the expenses related to winding up the trust and distributing the assets. Accordingly, this Court concludes that Ellis is entitled to an order that Linda distribute forthwith the 213 Milford shares free and clear of trust.
VI. ATTORNEYS FEES
A. Ellis’ Attorneys Fees
Ellis seeks an order that Varney Bros, pay her reasonable attorneys fees and expenses in prosecuting her derivative claims. Attorneys fees may be awarded, in the court’s discretion, to a party who has successfully brought a derivative action on behalf of a corporation. Martin v. F.S. Payne Co., 409 Mass. 753, 759 (1991); Coggins v. New England Patriots Football Club, Inc., 406 Mass. 666, 669 (1990). Such an award is paid from whatever proceeds of the action the corporation receives. Martin v. F.S. Payne Co., 409 Mass, at 758; Crowley v. Communications for Hosp., Inc., 30 Mass.App.Ct. at 767. The rationale for an award of fees is that one shareholder ought not bear the expense of a suit which benefits all the shareholders. Shaw v. Harding, 306 Mass. 441, 450 (1940).[33] The most important, but not dispositive, factor in determining whether attorneys fees should be awarded in a shareholder derivative action is whether the plaintiff has benefitted the corporation by the result obtained in the lawsuit. Dynan v. Fritz, 400 Mass, at 247. The court may also consider whether the defendants acted in good faith or bad faith, although a finding of bad faith is not essential to a lawful award of counsel fees, whether the controversy involved matters of business judgment, and whether the case involved novel legal questions. Dynan v. Fritz, 400 Mass, at 247; Smith v. Atlantic Properties, Inc., 12 Mass.App.Ct. 201, 211 (1981). This Court, in its discretion, shall award the plaintiff reasonable attorneys fees for the portion of the case that has been found to benefit the corporation. Given the severance of the issue, further proceedings, including the submission of additional evidence, are necessary.[34]
B. Indemnification of the Individual Defendants
Finally, Ellis seeks an order prohibiting Varney Bros, from paying any further attorneys fees and expenses incurred by Linda, Jon, Jerrier and Molloy in defending this action, and requiring them to repay to the corporation any attorneys fees and expenses already advanced. Article III, §10 of Varney Bros.’s bylaws provide in relevant part:
Each person now or hereafter a Director or officer of this corporation . . . shall be indemnified by this corporation against all expenses and losses reasonably incurred or suffered by him in connection with any claim, action, suit or proceedings, civil or criminal, actual or threatened, to which he may be made a party by reason of his being or having been such Director or officer as aforesaid, or by reason of his alleged acts or omissions as such Director or officer, except with respect to any matter as to which he shall have been adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his action was in the best interests of the corporation . . .
Further, Chapter 156B, Section 67, which permits but does not require indemnification for corporate directors, officers and employees, provides in relevant part: *426 G.L.c. 156B, §67 (2000). Pursuant to Varney Bros.’s bylaw, and in accordance with the statute, the individual defendants are entitled to indemnification in this action unless they acted in bad faith without a reasonable belief that their actions were in the best interests of the corporation. Under Massachusetts law, bad faith imports a dishonest purpose or moral obliquity, implying a conscious doing of wrong. It means a breach of a known duly through some motive of interest or ill will, and it partakes of the nature of fraud. Spiegel v. Beacon Participations, Inc., 297 Mass, at 416; Parker v. D’Avolio, 40 Mass.App.Ct. 394, 403, rev. den., 423 Mass. 1102 (1996). Although this Court has concluded that the individual defendants breached their fiduciary duties to Varney Bros, in failing to subject the Employment Agreement to independent scrutiny and in authorizing the excessive net profit bonus provision, this Court has also found that the defendants did not act with dishonesty or an improper purpose in doing so but rather, acted in what they reasonably believed to be the company’s best interests. Accordingly, indemnification of the individual defendants is proper, and Ellis is not entitled to the order she seeks. See Demoulas v. Demoulas Super Markets, Inc., 424 Mass, at 561-62 (finding corporate officer entitled to indemnification under by-laws where court failed to make express finding that he acted in bad faith); Dynan v. Fritz, 400 Mass, at 245-46 (finding officers entitled to indemnification under corporate by-laws where although court rescinded challenged transaction as having been in violation of director’s duiy of loyalty, it did not find that director acted in bad faith). Cf. Boston Children’s Heart v. Nadal-Ginard, 73 F.3d 429, 436-38 (1st Cir. 1996) (concluding that denial of corporate officer’s claim for indemnification was proper where trial court found he was disloyal and breached his fiduciary duties to corporation).
*425 No indemnification shall be provided for any person with respect to any matter as to which he shall have been adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his action was in the best interest of the corporation
*426 ORDER FOR JUDGMENT
For the foregoing reasons, it is hereby ORDERED that judgment on Count I enter in favor of the plaintiff against the defendants for breach of fiduciary duty, and it is ORDERED that judgment enter against Linda L. Varney, individually, in the amount of any bonuses actually received by her that represent proceeds from the sale of corporate assets.
On Count II of the complaint, it is hereby DECLARED and ORDERED that the 25% net profit bonus provision of the 1993 Employment Agreement with Linda L. Varney is defined so as to exclude from its computation the proceeds from the sale of corporate assets and all promissory notes made under color of it are null and void. It is further DECLARED and ORDERED that the amount of $485,000.00, is deemed surplus and available as dividends to the three shareholders on a pro rata basis.
It is further ORDERED that defendant Varney Bros. Sand & Gravel, Inc. reduce the drawing account of Linda L. Varney by $100,000.00. In the event that the drawing account of Linda Varney contains less than $100,000.00, the defendant Linda Varney is liable to the corporation for such amount of money by which her drawing account is less than $100,000.00. In such event, a constructive trust, for the benefit of the corporation, is imposed upon her to the extent and in the amount of the difference between the amount of her drawing account on the date of the entry of this decision and $100,000.00, pending its payment.
It is further ORDERED that the board of directors annually, in compliance with Art. II, §1 of the corporate by-laws, determine in their discretion what constitutes net earnings, profits, and surplus, determine in their discretion what amount shall be reserved for working capital and for any other purpose, and determine what amount shall be declared as dividends.
In addition, it is hereby ORDERED that Linda L. Varney, as trustee of the Donald A. Varney Trust, distribute forthwith to plaintiff Jane Ellis the 213 shares of stock in the Milford National Bank, free and clear of trust.
Attorneys fees shall be awarded to the plaintiff following further proceedings consistent with this decision.

Although such a claim for relief was made as a part of the active complaint it was waived in open court at the time of final arguments.

The trial of the case was scheduled to begin on March 3, 2003, and motions, in limine, were heard that day. The parties executed a waiver of their jury demand on March 4, 2003 and the evidence then commenced.

Parts A and B are taken from the opening pages of the Plaintiffs Proposed Findings of Fact and Rulings of Law, pp. 1-3.

In 1987, the company became a “subchapter S” corporation.

As will be discussed below, Linda and Richard had separated during 1989, due, at least in part, to Richard’s deteriorating health which caused or contributed to personality changes in him that included increasing irritability. They lived apart from then until Richard’s death in 1992, during which time a divorce action was pending and negotiations were being conducted, off and on, towards a divorce settlement agreement.

As will be discussed below, Jon’s sister Elizabeth Varney also owns 95 shares of stock in Varney Bros. Unlike Jon, however, she is not a party to this lawsuit.

The “Rose Champagne” litigation shall be discussed further, below.

Shelley D. Vincent Jr. was a long-time adviser to the Varney brothers, a respected member of the bar and president of the Milford National Bank and Trust. On his death, he was succeeded as clerk and director of Varney Bros, by his son Shelley D. Vincent, III, who was also an attorney and who also became president of the Milford Bank and Trust. Upon his resignation due to declining health, he was succeeded as clerk and director by Bartholomew Molloy, an attorney who had practiced corporate and business litigation law with the Vincents at a firm in Boston but who was then practicing law in Milford with an office in the building owned and occupied by the bank.

Linda continued to live expense-free at the 57 Bates Street property after Richard moved out on January 1, 1989. *427 Before Richard died, he entered into a Widow’s Agreement with the Corporation for the benefit of Linda. The Agreement provides for her to receive an annual stipend of $20,800 and the expense-free use of the Corporation’s property located at 57 Bates Street in Mendon. Linda has received the benefits of the Widow’s Agreement since Richard’s death. Ellis does not challenge Linda’s receipt of those benefits.

 As will be discussed below, this payment from and loan back to the corporation, together with the creation of corresponding “drawing accounts,” was another practice begun and customarily followed by the founders and Richard Varney in order that the corporation always have cash available for its needs, especially given periodic and regular cash-flow problems.

A variance lapses one year after it is issued if not used. G.L.C. 40A, §10.

Linda explained that her decision to deliver Richard’s two checks made out to her daughters was based upon a belief by her that Richard had intended to make the gift. However, her explanation as to why she did not deliver the other checks, especially the two signed by her and made out to Laurie and Tracy, appears to demonstrate an alternative: that Richard’s children would likely inherit under Richard’s estate and that it was unnecessary to deliver these gifts and that she could always benefit the children of her first marriage. I infer that she delivered these two checks based upon her belief that her daughters, treated by Richard as if they were his daughters as well, would not have any opportunity to inherit from him, thus either discrediting her testimony that it was Richard’s intention, and not her own, to make a gift to them or that they should be treated differently than the children of Richard. In any event notwithstanding that the plaintiff offered evidence suggestive of an improper distribution of estate assets on account of these checks, or a rightful claim by her on estate assets for her own gift, she has not shown an improper diversion of corporate assets.

It was during this period, while living apart from Linda, that “services” were rendered to him by Rose Champagne and which lay at the heart of litigation she commenced against the corporation and Richard’s estate.

The claim for services referred above in footnote 14 was successful against the estate of Richard.

As a retailer of cement, Varney Bros, understandably owns a fleet of cement trucks that are operated by drivers represented by the Teamsters Union. Linda’s conduct in her dealings with the union caused the union to ask her to serve as a management trustee of the union’s health and welfare fund, which she has done for the past several years. Linda’s good relationship with the union, notwithstanding one negotiation that actually resulted in a wage reduction, has helped preserve good relations and stability between Varney Bros, management and its workforce, which has been beneficial to the corporation.

While it is difficult to determine with certainty what Linda’s predecessor — Richard—earned for his services as chief executive officer, because of his use of a “drawing account” rather than forms of compensation more typical to the coiporate form which Linda instituted after his death, it appears that in 1986, 1987 and 1988, Richard was paid a salary of $300,000, $400,000, and $300,000, respectively. (Ex. 117, tax returns for 1986 (Sched. E.), 1987 (“officer’s compensation” of $550,000 less $150,000 payment to Linda), and 1988 (“officer’s compensation”).) It appears that Richard took either no salary or a modest five-figure salary in 1989, 1990, and 1991. (Ex. 117, tax returns for 1989, 1990 and 1991 (“officer’s compensation").) I infer that the reduction in Richard’s salary starting in 1989 probably reflected a tactical decision, as a result of the divorce proceedings, to minimize his financial picture.

It appears that the plaintiff is not making any direct or derivative claim on account of these perquisites. See Plaintiffs Proposed Findings of Fact and Rulings of Law, pp. 3; 23, ¶44. Insofar as such may be the basis of any claim, these terms are relatively standard, are fair and reasonable to Varney Bros, and reflect reasonable exercise of the directors’ business judgment. Likewise fair and reasonable from the corporation’s perspective and not the subject of any apparent claim by the plaintiff are the provisions of the contract relating to severance and disability provisions. None of those provisions have come into play over the course of the contract and Linda has received no compensation or benefits under any of them. To the extent they are relevant at all, they have been and reflect reasonable exercise of the directors’ business judgment.

Excludes “additional compensation,” which as of the time of trial had not been calculated or awarded because Varney Bros’s fiscal year had not ended and its profit, if any, had therefore not been determined.

See footnote 19, supra.

During the three years immediately preceding Richard’s death and Linda’s accession to the full responsibilities of chief executive officer, Varney Bros, also lost money. In 1989, Varney Bros, had an operating loss of about $300,000 and an overall loss in approximately the same amount. In 1990, Varney Bros, had an operating loss of about $169,000 and an overall loss of about $113,000. In 1991, Varney Bros, had an operating loss of about $318,000 and an overall loss of about $260,000. Varney Bros, had a small loss in 1988, a small overall profit in 1987, and a more significant overall profit in 1986. (Ex. 117, tax returns for 1986 through 1991.)

The information given to Burke at the September 1993, meeting with respect to a promissory note and security agreement supposedly executed by Ellis was incorrect. Ellis had, in fact, executed no such document. I infer that Burke was given that incorrect information because Linda misunderstood what Vincent, as trustee of the CEV Trust, had told her he had done with respect to distribution of Ellis’s Varney Bros, stock held in the trust. (Ex. 39.) Indeed, neither Vincent, nor anyone else at the Milford, had communicated with Ellis about the voting trust, nor any arrangements for securing her share of the obligation for repayment of the loan to Varney Bros, on account of its having provided the funds to pay inheritance taxes at any time prior to this meeting.

As Vincent would later explain in a letter to Linda in March 1994, Vincent stated to Burke in this letter that he paid a preliminary payment on the inheritance tax but was awaiting an appraisal decision of tax authorities on a question of valuation of company shares. What he did not explain to Burke at that time was that Ellis was going to bear a greater than one-third share of the inheritance tax liability and the trust’s consequent loan obligation to the corporation, due to the fact that she was inheriting her share free and clear of the trust, while the present and taxable interest of the other two heirs was only on interest income, as they were not yet of age to inherit free and clear. (Ex. 40.)

That letter is Exhibit 44, and it is dated March 18, 1994.

Vincent died in February 1997.

Linda did not distribute to Ellis the DAV stock until after Ellis engaged Raphaelson & Mullady to represent her. The stock certificate was endorsed on January 30, 1998 (Ex. 58), four days before the defendants met with Ms. Barker and Mr. Dinaro on February 3, 1998 to talk about the detention of Ellis’s stock in the CEV Trust.

It must be remembered that in 1998, Linda accrued, subject to this litigation, a bonus in the amount of at least $485,000.00, an amount that has not yet been paid but is rather the subject of a promissoiy note.

The minutes of director meetings that have been introduced into evidence do not appear to reflect, nor did the parties invite the attention of the court to any other source of documentation of the fact that the board of directors, for the years 2000, 2001 or 2002, have “determine[d] in their discretion what constitutes net earnings, profits, and surplus; determine[d] in their discretion what amount shall be reserved for working capital and for any other purpose.”

To the extent that the plaintiff claims that the employment contract was approved by directors who were not disinterested in the transaction, mere membership on a board of directors at the time of the alleged wrongdoing, without more, does not result in interested status. Harhen v. Brown, 431 Mass. 838, 846 (2000). A corporate director is “interested” if he is a party to the transaction, or has a business, financial or familial relationship with a party to the transaction, and that relationship would reasonably be expected to affect the director’s judgment with respect to the transaction in a manner adverse to the corporation. Harhen v. Brown, 431 Mass, at 843 n.5; Demoulas v. Demoulas Super Markets, Inc., 424 Mass, at 523. A director is also “interested” if he is subject to a controlling influence by a party to the transaction or a person with a material pecuniary interest in the transaction or conduct and that controlling influence could reasonably be expected to affect the director’s judgment with respect to the transaction. Harhen v. Brown, 431 Mass, at 843 n.5; Demoulas v. Demoulas Super Markets, Inc., 424 Mass, at 523; Cote v. Levine, 52 Mass.App.Ct. 435, 442 (2001). With respect to the Employment Agreement, Jon was not a disinterested director because of his familial relationship with Linda, who benefitted financially from the transaction. Vincent did not benefit financially from the Employment Agreement nor has it been demonstrated that he was subject to Linda’s controlling influence so as to preclude him from exercising his independent judgment.
Similarly, Jerrier did not benefit financially from the Employment Agreement, nor was she found to be subject to Linda’s controlling influence. Ellis argues, however, that Jerrier is interested because she was an employee and executive officer of the corporation, citing Demoulas v. Demoulas Super Markets, Inc., 1995 WL 476772 *76 (Mass.Super.Ct.) (Lopez, J.) (director is only independent if she is non-management director: one who is not paid to devote substantially full time and attention to corporate affairs). There does not appear to be any appellate authority in Massachusetts which adopts this standard, and the application of the standard is problematic in close corporations, where most if not all of the directors will also be corporate officers or employees. In affirming Judge Lopez’s decision in Demoulas, the SJC did not state that a director who is also an officer or employee is per se interested; rather, it stated, “The judge found, with support in the evidence, that all members of the boards of directors of DSM and Valley during the periods in question were members of Telemachus’ family or were otherwise ’’interested" directors, in that they had a business or financial relationship with Telemachus, were subject to his controlling influence, or stood to benefit personally from the transactions at issue." Demoulas v. Demoulas Super Markets, Inc., 424 Mass, at 523.
Even if this Court were to adopt Ellis’ position that Vincent and Jerrier were not disinterested, then the Board’s decision loses the presumption of propriety afforded by the business judgment rule, and the burden shifts to Linda to show fairness to the corporation in a self-dealing transaction made by interested directors. Demoulas v. Demoulas Super Markets, Inc., 424 Mass, at 531. As will be seen below, this standard was found to have been met by the defendant Linda Varney with respect to all of the compensation agreement except the bonus provision, so the ultimate result would not be changed by a finding that either Vincent or Jerrier, or both were not “disinterested.”

Ellis argues that Molloy’s acquiescence in the Employment Agreement, beginning at his election in 1997 and continuing, is a breach of his fiduciary duly as a director because he participated in granting Linda salary increases under the contract and failed to act to rescind it when Ellis initiated this suit challenging its fairness to the corporation. A director has a duty to keep himself informed about the conduct of the business, and a director cannot avoid liability by neglecting his duties and then claiming ignorance. Allied Freightways, Inc. v. Cholfin, 325 Mass, at 634; Juergens v. Venture Capital Corp., 1 Mass.App.Ct. 274, 278 (1973). The fact that Molloy was not a member of the Board at the time the Employment Agreement was authorized thus does not relieve him of liability for breach of fiduciary duty with respect to subsequent actions taken by the Board concerning the Agreement. However, Molloy’s participation in granting Linda annual salary increases under the Employment Agreement did not breach his fiduciary duty to act with reasonable intelligence in the best interests of the corporation because this Court has concluded that her salary was reasonable. At most, Molloy could be deemed to have breached his fiduciary duty in participating in granting payments to Linda under the unfair net bonus provision of the Employment Agreement, although there is no evidence that he acted in bad faith or without reasonable intelligence in doing so. Therefore, he bears no personal liability.

To effectuate this result, the defendant Barbara Jerrier shall certify to this court, on behalf of the corporation, the amount contained in Linda Varney’s drawing account as of the date of the entry of this order.

Nor has Ellis proved that Linda’s conduct in connection with the 45 shares of stock was motivated by a desire to exclude Ellis from Varney Bros. in breach of Linda’s fiduciary duty as a director. See Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass, at 598; Andersen v. Albert & J.M. Anderson Manuf. Co., 325 Mass. 343, 346-47 (1950) (it is breach of duty to take advantage of directors’ special position to manipulate stock or exclude beneficial owners from exercising their rights in order to secure control of the corporation). See also Jessie v. Boynton, 372 Mass. 293, 304 (1977) (director has fiduciary duty of fair dealing concerning proposed corporate action which may adversely affect one or more shareholder’s interests).

Thus, legal services undertaken only to benefit Ellis cannot properly be charged against the corporation. See Dynan v. Fritz, 400 Mass, at 248 n.26. See also Coggins v. New England Patriots Football Club, Inc., 406 Mass, at 670 (attorneys fees cannot be awarded where plaintiff shareholders recovered directly on their personal claims, not derivatively).

To effectuate this process with respect to the attorneys fees sought by the plaintiff, the court generally adopts the suggestions of the plaintiff made by her in her requested ruling no. 70, at page 85, of her Proposed Findings of Fact and Rulings of Law, for further proceedings to be conducted under the provisions of Rule 9A of the Superior Court. The plaintiff shall produce to defendants’ counsel within 21 days of this order, copies of the bills for attorneys fees and expenses for which the plaintiff seeks reimbursement. If the defendants object to any portion of the amount of the plaintiffs attorneys fees demanded, they are granted 21 days to serve a brief in opposition upon plaintiffs counsel in which their objections and arguments are made in detail, and the plaintiff is granted leave to file all such documents with the court, including a reply brief, within 21 days. Either party may request a hearing and shall support any such request, including the need for additional evidence, with reasons therefore. The court reserves leave to determine whether, and to what extent, a hearing may be necessaiy.